**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **MICHAEL JAMISON, GREGORY** | § | |
| **DEAN TINNELL and EARNEST HUNTER** | § | **CIVIL ACTION NO.: 3:16-CV-3247-D** |
| **AND DOROTHY WILLIAMS** | § | |
| | § | |
| *Qui Tam Relators* | § | |
| | § | |
| **VS.** | § | **JURY TRIAL REQUESTED** |
| | § | |
| **CAREER OPPORTUNITIES, INC.** | § | |
| | § | |
| *Defendant.* | § | |

**FIRST AMENDED COMPLAINT**

**TO THE HONORABLE COURT:**

Plaintiff UNITED STATES OF AMERICA, by and through Relators MICHAEL JAMISON, GREGORY DEAN TINNELL, EARNEST HUNTER, and DOROTHY WILLIAMS hereby file this their First Amended Complaint, and state as follows:

**INTRODUCTION**

1.      This is a civil action for damages and civil penalties brought by Relators on behalf of the UNITED STATES OF AMERICA, pursuant to 31 U.S.C. §§ 3729, *et seq.* pertaining to false and/or fraudulent claims, invoices, vouchers, reports which the Defendant Career Opportunities, Inc. ("COI") submitted or caused to be submitted to the United States Government for the express purpose and intent of receiving money from the United States Government based on COI's fraud.  Defendant COI received funds from the United States Department of Labor ("DOL") through Title I of the Workforce Investment Act of 1998 ("the WIA") related to the Job Corps Program ("the Program").

## THE PARTIES

### A.   Plaintiff

2.      Plaintiff is the United States of America ("Plaintiff") on whose behalf Relators bring this action.  The United States of America is here named a plaintiff because funds of the United States of America ("Job Corps funds") were paid, and are continuing to be paid, to Defendant COI through the Job Corps program as a result of the false and fraudulent claims as alleged in this Complaint.

### B.   Relators

3.      Relator Michael Jamison ("Jamison") is a resident of Denton County, Texas.  He was employed by Del-Jen, Inc. ("Del-Jen") as the Safety, Security and Transportation Manager from August, 2012 to May 2014 at the North Texas Job Corps Center in McKinney, Texas ("NTJCC").

4.      Relator Gregory Dean Tinnell ("Tinnell") is a resident of Fannin County, Texas. He was employed by Defendant COI.  Tinnell worked at the NTJCC from 2008 to 2012 as a Career Advisor and as a Career Advisor Director.

5.      Relator Earnest Hunter ("Hunter") is a resident of Collin County, Texas**.**  He was employed by Del-Jen as a Recreation Specialist from approximately October of 2012 through October of 2013 at the NTJCC.

6.      Relator Dorothy Williams ("Williams") is a resident of Ferriday, Louisiana. Williams was employed by Defendant COI in many capacities for ten years beginning in approximately 2004 until April, 2014. Williams was the Student Services manager from approximately March of 2012 through April of 2014 at the NTJCC.

7.      Jamison, Tinnell, Hunter, and Williams are referred to collectively herein as "Relators".

C.      **Defendant**

8.      Defendant COI is a Texas Corporation that was formed April 9, 2004. As of the report year 2015, COI's officers and directors were listed as follows: President and Director, Lana Kite ("Kite"); Vice President and Director, Pam Hess ("Hess"); Secretary and Treasurer, Kerry Brockman.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 *et seq.*

10.     This Court has *in personam* jurisdiction over COI under 31 U.S.C. § 3732(a), which authorizes nationwide service of process.

11.     This Court has personal jurisdiction over COI pursuant to 31 U.S.C § 3732(a) which provides that any action under this section may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by 31 U.SC. §§ 3729, *et seq.* occurred.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because COI can be found in, reside in, and/or transact business in this district and because some of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

A.      **The Job Corps Program**

13.     Job Corps was created by the Workforce Investment Act of 1998, 29 U.S.C. §§2881, et seq. Job Corps purpose and mission is to provide educational and career technical skills, training, and support services through a nationwide network of campuses offering career development services to at risk young men and women ages 16 through 24.

14.     Private companies submit bid proposals to the United States Department of Labor ("DOL") to operate and manage Job Corps programs through Job Corps Centers such as the North Texas Job Corps Center in McKinney, Texas ("NTJCC"). Companies awarded contracts by the DOL are called operators. The private companies that are awarded contracts to operate the Job Corps Centers must follow the strict mandates of 29 U.S.C. §§2881, et seq., 20 C.F.R. Parts 638 and 670, the DOL Job Corps Office "Policy and Requirements Handbook" ("PRH") and guidelines and procedures established by the Secretary of Labor. Since May 2002, these contracts are performance based with incentive fees, bonuses and contract extensions.

15.     Each Job Corps Center's performance is compared with all national Job Corps Centers' performance in the areas such as: (1) total number of students enrolled at the Center, (2) evaluations of students' achievement of academic and vocational credentials, (3) initial job placements, and (4) ongoing job placements following the initial placement.

16.     Operators can receive incentive fees, bonuses and extensions of their contract if their Center has a favorable rating compared to other Centers. A favorable rating is based upon the data-numbers provided by each Center to the DOL. Thus, the higher number of students that are retained, graduated and placed in a job by a Center, the more money made by the operators and the greater chance of receiving incentive fees, bonuses and extensions on the DOL contracts. Thus, Center operators have significant financial incentive to demonstrate on paper that they have retained, graduated and placed as many students as possible, notwithstanding any violations of DOL regulations and policies.

17.     The statutory and administrative requirements of 29 U.S.C. §§2881, et seq., 20 C.F.R. Parts 638 and 670, the PRH, guidelines and procedures established by the Secretary of Labor that affect the retention of students mandates that all Centers enforce the following:

(1)     **Student qualification**

Prospective students must meet the following requirements for enrollment: (a) legal residency status, (b) emotional stability without objective behavioral problems, (c) does not have a criminal record, (d) does not use illegal drugs, (e) and does not require any face to face court or institutional supervision or court-imposed fines while enrolled in Job Corps;

(2)     **Zero tolerance**

Each Center is mandated to enforce a "zero tolerance policy" against students using drugs and other controlled substances, committing any act of violence against another student such as assault, rape or other bodily harm and any engagement in inappropriate sexual behavior.

18.     The WIA also provides that state law governs the requirements for educational certifications.

19.     *Texas Education Code* § 18.005 entitled "Governance; Limitation on Powers; Duties" provides in relevant part:

"(a) A Job Corps diploma program shall be governed as provided by this chapter and policies established by the Job Corps training program operating the diploma program. Unless otherwise provided by this chapter, a provision of this code applicable to a school district does not apply to a Job Corps diploma program….

(c) A Job Corps diploma program shall…

(3) provide a course of instruction that includes the required curriculum under Subchapter A, Chapter 28;

(4) require that students enrolled in the diploma program satisfy the requirements of Section 39.025 before receiving a diploma under this chapter…"

20.     *Texas Education Code* § 39.025 provides that a student cannot receive a high school diploma unless the student performs satisfactorily on the end of course assessment instruments required by the commissioner and this section.

**B.      Del-Jen, Inc.**

21.     Del-Jen, Inc. ("DJI") was acquired by Fluor Corporation ("Fluor") in January 2003 because DJI was a leading provider of education and training services to the Department of Labor, particularly through its Job Corps programs. Exhibit 1 are true and correct copies of excerpts from the Form 10-K Annual report for report period 2002-12-31 filed by Fluor with the SEC on March 31, 2003.

22.     Around September 2003, DJI was awarded a contract to operate the Job Corps Outreach, Admissions & Career Transition Services program for the state of Ohio. The five-year contract was valued more than $7 million.

23.     During the period of April 26, 2007 through May 9, 2007, DJI was awarded the following contracts to operate and manage Job Corps Centers in the United States:

(1)     Clarksville, TN. Contract #DOLJ04QA0001 for $4.3 million for period 10/25/06 – 9/30/09.

(2)     Clarksville, TN. Contract #AE63056600 for $12.6 million for period 11/20/06 – 10/1/09.

(3)     Clarksville, TN. Contract #DOLJ07UA00015 for $54.9 million for period 4/13/07 – 12/30/12.

(4)     Clarksville, TN. Contract #DOLJ07QA00002 for $30.1 million for period 4/13/07 – 7/31/12.

(5)     Clarksville, TN. Contract #DOLJ07UA00016 for $49.4 million for period 4/26/07 – 11/30/12.

(6)      Clarksville, TN. Contract #DOLJ07RA00014 for $9.58 million for period 5/9/07 – 1/31/13.

24.      On November 3, 2009 the Office of Job Corps published a report on the Performance Audit of Del-Jen, Incorporated Job Corps Centers. Exhibit 2. The Office of the Inspector General ("OIG") found significant incidents of student misconduct that was not reported to Job Corps. See Exhibit 2 page 6. "The significant incidents involved a total of 42 students and included physical assault, weapons possession, and narcotics possession" See Exhibit 2, page 7.

**C.      Career Opportunities, Inc., DJI and North Texas Job Corps Center**

25.      Around August 31, 2010, Career Opportunities, Inc. ("COI") was awarded a $95 million contract from the DOL to manage and operate the North Texas Job Corp Center in McKinney, Texas ("NTJCC"). DOL contract #DOLJ10F6TX017 was for the term 10/28/10 – 10/31/15.

26.      On October 1, 2010, DJI and COI entered into an agreement entitled "Subcontract Agreement" regarding the operation of the NTJCC ("Subcontract Agreement"), Exhibit 3. The Subcontract Agreement sets forth that "COI and DJI have prepared and submitted "jointly" a proposal to the DOL for the operation of the NTJCC pursuant to the DOL's solicitation S10F6TX017 ("DOL Submission"). This joint submission to the DOL is not coincidental and Exhibit 3 is misleading as to the nature of the relationship between COI and DJI. Prior to this submission, COI had never received a contract from the DOL to manage and operate a Job Corps Centers. As of the date of the DOL Submission, DJI was operating at least four other Job Corps Centers, had been involved with the operation and management of Job Corps Centers before its acquisition by Fluor in 2003 and during the above-referenced two week period in 2007 had been awarded over $160 million in Job Corps contracts to run and operate Centers.

**D.    Lana Kite and Maria Martin**

27.    At the time of the DOL Submission, Lana Kite ("Kite") was listed as a principal/owner of COI at the time of the DOL Submission, had an existing working relationship with DJI and the Relators are informed and believe and therefore allege that Kite had significant ties with Fluor and/or DJI as either an employee or other significant contact.

28.    Maria Martin ("Martin") was befriended by Kite in New Mexico prior to the DOL Submission. At the time Martin applied to DJI for employment, Martin was young, inexperienced and unemployed. Kite used and relied on Martin to be the on-site point person for Kite at the NTJCC. Kite caused DJI to employ Martin for the NTJCC despite the facts that (1) Martin had no prior experience with a Job Corps Center, (2) Martin had no prior experience in the administration of a governmental contract, (3) Martin had no experience in the areas of security, education, job training, job placement, (4) Martin had no management experience, (5) Martin did not have a college degree and it is unknown if Martin even graduated from high school. Thus, Martin was the alter ego of Kite at NTJCC regardless of her title and notwithstanding any superficial change from DJI to COI, though it is instructive that Kite required that Martin be first hired through DJI. Martin was essentially the ultimate authority since she only answered to Kite. Thus, Martin dictated daily operations and policy to DJI and COI.

29.    Under 29 U.S.C. 2881, et seq., COI was required to report information on the operations of NTJCC. The information provided by COI and DJI was used to rank the performance of NTJCC as compared to other Centers.

30.    If a Center fails to meet the expected levels of performance, the Center is subject to a variety of actions by the DOL, including but not limited to, changing the management staff of the Center, replacing the operator of the Center, relocating the Center or closing the Center. Failure to meet levels of performance also means the Center will not receive any bonus monies and will

not receive any contract extensions.

31.     As of 2011, NTJCC received $37,880 per each student that was enrolled (which presumes the students were eligible under the WIA requirements) and $76,574 for each student that graduated with a diploma, GED or trade certificate and was placed in a job.

**E.      Procedural History**

32.     Relators filed the Original Complaint under seal on November 19, 2013, on behalf of the United States against COI and Del-Jen.

33.     On November 20, 2014, the United States filed a Notice of Election to Decline Intervention and the Court ordered the Complaint be unsealed for the purpose of serving COI.

34.     On September 16, 2016, the U.S. District Court for the Northern District of Texas, Dallas Division, Judge Sam Lindsay, presiding, dismissed COI "without prejudice" in Case No. 3:13-cv-4616 ("Case 4616"). The Court stated in its Memorandum and Opinion that one of the reasons it was not exercising its discretionary authority to extend time to serve the complaint was the Court determined that the applicable statute of limitations would not prevent a refiling of the lawsuit.

35.     On November 18, 2016, *qui tam* Relators Michael Jamison, Gregory Dean Tinnell, and Earnest Hunter filed a False Claims Act Complaint (Doc. 2) under seal on behalf of the United States against Career Opportunities, Inc. ("COI").

36.     On May 12, 2017, the United States filed a Notice of Election to Decline Intervention. (Doc. 7.)

37.     On May 24, 2017, the court ordered the complaint be unsealed for the purpose of serving Defendant (doc. 8).

38.     On August 16, 2017, COI filed the herein Rule 12(b)(6) Motion to Dismiss (Doc. 11).

## FIRST CLAIM FOR RELIEF

## FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A) - FALSE CLAIMS

39.     Relators re-allege and incorporate by reference the allegations of paragraphs 1 through 38 above as if the same were fully set forth herein.

40.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

41.     Around October 1, 2010, Kite held a meeting in the afternoon with Martin, Kathy Adams, Eddie Williams and Tommy Johnson at Hutchins BBQ and Catfish located at 1301 N. Tennessee St., McKinney, TX. At the meeting, Kite discussed specifically how to submit fraudulent reports to the DOL for payment. Due to Kite's experience with DJI and Fluor, Kite explained that they would bill DOL two times a month and that the government would pay within 30 days. Submission for payment was to be done on Form 2110 and that the government would direct deposit by voucher into COI's account. Kite explained that technically, COI was the contractor that received the DOL contract, but, DJI was going to be the true administrator and manager of the Center. Kite informed everyone that Martin was her right hand and that Martin had Kite's full authority for the operations at the Center. Kite explained that the COI/DJI management would operate the Center in a departmental fashion. There was an admissions department, a security department, an education department (which included high school diploma or its equivalency and trade certification), and post-graduation/certification job placement. Each department was in charge of submissions every two weeks for final submission to the DOL. Either Kite or Martin would review submissions before being formally sent to the DOL for payment. Kite explained at this meeting that payment by the DOL was based upon the following factors: (1) numbers of students admitted and retained by the Center, (2) number of students that graduated with a certificate, diploma or GED and (3) number of students that were

placed in a job. Kite informed the meeting that it was a numbers game and it did not matter if any of the students were qualified to be at the Center, actually received an education or were actually placed in a job, the most important thing was to prevent and disclosure to the DOL or disclosure of any problems at the Center to local authorities such as the McKinney Police Department. Kite explained the problems created at another Job Corps Center that was run by DJI when the OIG audited the Center and found violence and drug problems. Kite emphasized that the most important thing to remember was never disclose to the government any problems in either of the department.

**Admissions**

42.    During the period October 2010 through November 2013, of the total amount of students the Center admitted and enrolled, 65% were either ineligible due to prior criminal records or other factors in violation of the above-described requirements of the WIA, or became ineligible due to violations while enrolled.  However, despite the fact that these students were not eligible to be enrolled at the Center, Williams repeatedly submitted to the DOL, beginning in September, 2012, and continuing until at least October 2013, false and fraudulent documentation, falsely certifying both as to number and qualifications of the students. The fraud and falsification of documentation is reflected in the DOL's Outreach and Admissions Report Card by Rank for the Report Period 10/1/2012 – 9/30/2013. An example are the following students that should have been enrolled at the Center and were separated for disciplinary issues ranging from severe violence to authority and behavior problems: Student numbers 1356826, 1341703, 1400252, 1421167, 1420619, 1346550, 1333236, 1342121, 1343122, 1384565, 1356826, 1320071, 1415510, 1302357, 1401602, 1293891, 1385610, 1196216, 1301963.

43.    All information contained in this DOL report is provided by the NTJCC, and the information contained in the reports was prepared and approved by Amoran, Kite, Martin,

Wilkens, Williams and Tina McDade. In this report, based upon such false and fraudulent information, the NTJCC achieved an overall rating of 80.2% and an overall ranking of 34 out of 70, resulting in bonuses and incentive awards which were not earned and for which COI is liable to the United States. The report shows that during the same period of time NTJCC had 463 total arrivals (not including existing students on the campus during the time of the report). *See* Exhibit 4, attached hereto.

44      As a direct result of such false reporting, COI received a total of $64,555,808 during the period of the contract as follows:

10/28/10 - $3,308,290

12/17/10 – $124,690

2/17/11 - $4,696,210

3/23/11 - $1,632,800

4/29/11 - $3,450,780

6/9/11 - $17,660

7/28/11 - $4,866,930

11/16/11 - $4,668,900

2/1/12 - $4,970,540

5/31/12 - $401,498

6/8/12 - $692,452

6/21/12 - $365,894

7/3/12 - $4,851,270

9/14/12 – 1,012,710

10/19/12 - $5,123,900

12/31/12 – 340,253

2/1/13 - $3,948,000

4/18/13 - $3,590,090

4/30/13 - $506,425

5/24/13 - $192,152

6/27/13 - $293,536

7/23/13 - $5,889,000

8/1/13 - $8,858

9/26/13 - $643,322

10/30/13 - $5,669,950

3/18/14 - $1,954,080

6/9/14 - $2,298,900

7/2/14 - $317,339

8/5/14 - $7,273,340

2/18/15 - $572,468

45.     COI with the assistance of DJI engaged in fraud since the inception of the contract on October 2010. During the period of time October 2010 through February 24, 2016, Relators, upon information and belief, allege that the United States Government has been defrauded in the amount of $64,555,808, according to proof at the time of trial.  Such amounts are owed to the United States, and COI is liable therefor.

**Security**

46.     COI regularly and as a standard practice ignored and covered up serious acts of violence by students against each other, such as criminal battery, sexual assaults, rape and other forms of violence. Students were also allowed to use, solicit and sell drugs to each other at the Center. From August 2012 through November 2013, Jamison repeatedly reported these violations

to Martin. Martin refused to take any actions regarding such violations and refused to take appropriate actions against the students that committed such violations. Jamison had notified Amoran three times a day of drug overdoses on the campus. None of these were ever reported by Amoran and were never reflected in any of the documentation submitted to the DOL. Such omissions in reporting were intentional, were material because they impacted directly both the certification of the facility and the amount of students legally enrolled for which COI was lawfully entitled to payment, and were relied upon by the United States to its detriment, causing damages as alleged herein.

47.     Some of the more egregious incidents of breaches of security, which were fraudulently not reported, were when students (both male and female) were raped. These rape victims were never treated by a doctor, and were never taken or referred to a hospital for treatment. Jamison was regularly prohibited by Martin from contacting the local police despite the fact that the NTJCC had a Concurrent Jurisdiction Agreement with the McKinney Police Department which made it the responsibility of the NTJCC to cooperate with the local police and inform them of violations such as rape, assault, battery, and drug violations.

48.     Since the DOL had specific policies and regulations against such violence and drug usage (which meant it was the duty of COI to expel these students for such conduct), COI had the financial incentive to ignore these violations to retain the students for the purpose of ranking and bonus payments and acted upon said incentive by engaging in its fraudulent scheme.   Such omissions in reporting were intentional, were material because they impacted directly both the certification of the facility and the amount of students legally enrolled for which COI was lawfully entitled to payment, and were relied upon by the United States to its detriment, causing damages as alleged herein.

49.     COI and DJI submitted their requests for payment on Form 2110 without disclosing any of the violations of the DOL regulations and policies.

**Education**

50.     NTJCC was ranked by the amount of students it graduated and the level of literacy of the students. From October 2010 to December 2013, NTJCC students received either classroom instruction or online instruction to achieve either a high school diploma or the equivalent of a GED.

51.     Online instruction was though New Learning Resource ("NLR") which was a Mississippi based online instruction. NLR promoted itself as a "school district" and issued a North New Summit School High School Diploma to its graduates. *See* Exhibit 3, attached hereto and incorporated by this reference.

52.     More traditional instruction was provided through classroom participation at NTJCC. Students that received such instruction were initially assessed using the Test Adult Basic Education (TABE) diagnostics. Students TABE scores were initially used to determine whether the student went to the high school online diploma curriculum or the GED curriculum at NTJCC. All curriculum at NTJCC was required to comply with the Texas Education Code §§ 18.005(c) & 39.025.

53.     Teachers at NTJCC were regularly forced to assist the students in their testing for the GED or diploma requirements since COI was rated on the amount of graduating students and the level of literacy. Attached as Exhibit 4 is a copy of an Outcome Measurement System Center Report Card by Rank for the Report Period of 7/1/2012 – 6/30/2013.  In this report, NTJCC has an overall ranking of 34 and a GED/HSD ranking of 49 which gives them an overall rating of 104.6% (which represents the percentage of meeting the DOL's goal for this area that year). NTJCC also reports a literacy ranking of 98.

54.     Exhibits 5 through 7, attached hereto and incorporated by this reference, are examples of the fraudulent and false reporting to the DOL, which, on information and belief, were prepared by Amoran, Martin, and Dawson, and then submitted by and on behalf of COI to the DOL.   Exhibits 5-7 falsely report that students were receiving diplomas from NLR, despite the fact that though their TABE scores were as low as the second grade for math and 5th grade for reading. At any given time, only 10% of the NTJCC students were able to perform high school math.

55.     On information and belief, COI received additional monies and bonuses from the DOL based upon the amount of students that were reported graduating with a GED, high school diploma or trade certifications.   Relators reserve the right to allege the extent of such damages more specifically following discovery herein.   Such false reporting was intentional, was material because it impacted directly both the certification of the facility and the amount of students legally enrolled for which COI was lawfully entitled to payment, as well as performance bonuses, and was relied upon by the United States to its detriment, causing damages as alleged herein.

**Placement**

56.     NTJCC received $76,574 per each student it placed in a job consistent with their training and education. Before a student was qualified to be placed in a job, the student had to be qualified to be a student in the first place, then had to achieve a high school education or equivalency and/or trade certification.

57.     COI contracted with a company called Results Staffing Agency ("RSA"). NTJCC Career Advisors ("CA") referred students to RSA to fill out paperwork for a job placement. The paperwork was designed to have the appearance of an employment application as if the student were getting a job through RSA. RSA inputted applications into their system. RSA then filled out the employment verification certificates which were sent to NTJCC and then forwarded to the

DOL as part of the NTJCC's statistics for ranking, bonuses, incentives, and the like.

58.     Exhibits 8 through 12, attached hereto and incorporated by this reference, are examples of the fraudulent and false reporting of purported "placements." Though the documents reflect employment verifications, none of the students listed ever worked at the alleged places of employment.

59.     During the period October, 2010, through November, 2013, there were eight CA's that worked on the placement statistics. The CA's were supervised by Amanda Ulliman ("Ulliman"). Standard practice was that there were weekly meetings which included Amoran, Martin and Ulliman. The CA's had a quota of placements that had to be met since there was a 90-day deadline from the date of graduation or certification for the NTJCC to receive the maximum money and ranking from the DOL. During this period of time, 576-960 students were reported as being placed in a job as required by the DOL requirements and the directive to the NTJCC under the WIA. In fact, over 80% of the students reported as being placed were fraudulently misrepresented as being placed, as reflected in Exhibits 8-12. At all times, Ulliman, Amoran, and Martin demanded, approved and directed these phantom "placements." Thus, COI received an estimated $35,285,299-$58,808,832 from the DOL due to the fraud and false documentation of these placements. Such amounts were fraudulently obtained, and COI is liable to the United States for refund of such monies.

60.     By committing the acts described above, COI and its agents and employees knowingly presented and caused to be presented to the United States government false and fraudulent claims, records, and statements in order to obtain Department of Labor funding for students in Job Corps programs at their campuses. Such fraudulent misrepresentations were made knowingly, were material, and were intended to deceive the United States, and were relied upon by the United States to its detriment and substantial harm.

61.     Through the acts described above, and otherwise, COI and its agents knowingly made, used, and/or caused to be made or used false records and statements in order to have such false and fraudulent claims paid and approved by the United States government.

62.     Through the acts described above and otherwise, COI, its agents and employees knowingly made, used and caused to be made or used false records and statements to fraudulently inflate, and increase COI's entitlement to receive federal funding.  COI also failed to disclose to the government material facts that would have resulted in COI's ineligibility to receive federal funding.

63.     The United States and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by COI, its agents and their employees paid and continue to pay COI for claims that would not have been paid had COI not submitted false claims for payment.

64.     Such monies obtained by COI through such fraudulent conduct are owed to the United States, and COI is liable therefor.  Plaintiff United States has proximately sustained damages as a result of COI's false or fraudulent claims in an amount of $64,555,808 and to be determined at trial, for which judgment is demanded from COI, trebled pursuant to law.

## SECOND CLAIM FOR RELIEF

## FALSE CLAIMS ACT, 31 U.S.C § 3729(a)(1)(B) - FALSE STATEMENTS

65.     Relators re-allege and incorporate by reference the allegations of paragraphs 1 through 64 above as if the same were fully set forth herein.

66.     Through the acts described above, COI, its agents and their employees knowingly presented and caused to be presented to the United States government false and fraudulent claims, records, and statements in order to obtain Department of Labor funding for students in the Job Corps programs at their campuses.

67.     Through the acts described above, and otherwise, COI, its agents and their employees knowingly made, used, and/or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States government.

68.     Through the acts described above and otherwise, COI, its agents and their employees knowingly made, used and caused to be made or used false records and statements to fraudulently inflate, and increase COI's entitlement to receive federal funding.  COI also made fraudulent omissions of facts that, if disclosed, would have demonstrated the falsity of the statements submitted, and failed to disclose to the federal government material facts that would have resulted in COI's ineligibility to receive federal funding.

69.     The United States and its fiscal intermediaries, unaware of the falsity of the records, statements, and claims made or submitted by COI, their agents and their employees has paid, and continues to pay COI for claims that would not have been paid if COI had not submitted false claims for payment.  Such wrongfully obtained sums are due and owing to the United States.

70.     By reason of COI's false records, statements, claims and omissions and the acts taken in furtherance thereof, the United States has been damaged in the amount of $64,555,808 dollars in Department of Labor funding, for which judgment is demanded from COI, trebled pursuant to law.

## THIRD CLAIM FOR RELIEF

## FALSE CLAIMS ACT CONSPIRACY

71.     Relators re-allege and incorporate by reference the allegations of paragraphs 1 through 70, as if the same were fully set forth herein.

72.     COI is liable under 31 U.S.C. § 3729(a)(3), because COI has conspired with others to commit the violations of law as alleged above.

73.     Through the acts described above and otherwise, COI entered into a conspiracy with DJI, Fluor and others to defraud the United States by submitting and collecting false and fraudulent claims, invoices, vouchers and reports, allowed or paid.  COI has also conspired with DJI, Fluor and others to omit disclosing or to actively conceal facts, which if known, would have reduced or eliminated government obligations and benefits to them.  COI has taken substantial steps in furtherance of those conspiracies by falsifying enrollment reports and other records by submitting such records to the federal government for payment or approval and by directing their agents, consultants and personnel to not disclose and/or to conceal COI's fraudulent practices, all of which is more specifically alleged above.

74.     The United States and its fiscal intermediaries were unaware of COI's conspiracy or the falsity of the records, statements and claims made by COI and its agents, their employees and their co-conspirators. As a result, Plaintiff has paid and continues to pay millions of dollars in DOL funding for NTJCC that it would not otherwise have paid.

75.     By reason of COI's conspiracy and the acts taken in furtherance thereof, the United States has been damaged in the amount of many millions of dollars in DOL Job Corps funding, for which judgment against COI is demanded, trebled pursuant to law.


## DEMAND FOR ATTORNEYS' FEES

76.     Pursuant to 31 U.S.C. § 3729(a)(3), Relators demand judgment against COI for the reasonable and necessary attorneys' fees, witness fees, and other costs and expenses reasonably incurred herein, of and from COI.

## NOTICE TO THE UNITED STATES

77.     Relators have complied with the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(1), with the filing of the Original Complaint on November 19, 2014  in Case 4616.  This

disclosure statement supports the existence of "submission of a knowingly false or fraudulent claim for payment or approval," under the False Claims Act, 31 U.S.C. § 3729(a)(1).  Relators have thereby complied with all conditions precedent to the bringing of this action for the benefit of the United States.

## JURY DEMAND

78.     Plaintiff and Relators demand a jury trial.

## PRAYER

WHEREFORE, Plaintiff and Relators pray that this Honorable Court enter judgment against COI as follows:

A.     That COI cease and desist from violating 31 U.S.C. § 3729, *et seq.*

B.     That COI is liable to Plaintiff in an amount equal to three times the amount of damages the United States has sustained as a result of COI's actions, as well as a civil penalty against COI for each violation of 31 U.S.C. § 3729, or, alternatively, liquidated damages pursuant to agreements with the COI;

C.     That the Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D.     That the Relators be awarded all costs and expenses of this action including reasonable and necessary attorney's fees; and

E.     That the United States and Relators receive all such other relief as the Court deems just and proper.

Respectfully submitted,

**ENGLISH LAW GROUP, P.L.L.C.**

*/s/ Jay C. English*
**JAY C. ENGLISH**
State Bar No. 06625290
jenglish@englishpllc.com
J. Scott Perry
State Bar No. 15802500
sperry@englishpllc.com

/s/ Emil Lippe, Jr
**Emil Lippe, Jr..**
State Bar No. 12398300
emil@texaslaw.com
7616 LBJ Freeway, Suite 500
Dallas, Texas 75251
Telephone: 214.528.4300
Facsimile: 972.733.1335
**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of September 2017, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  The electronic case filing system will send a "Notice of Electronic Filing" to the following attorneys of record.

Victor Vital
William R. Stewart
Barnes & Thornburg LLP
2100 McKinney Avenue, Suite 1250
Dallas, TX 75201

Timothy S. Durst
John B. Lawrence
Josue Caballero
Baker Botts L.L.P.
2001 Ross Avenue
Dallas, TX 75201

I further certify that on the 6th day of September 2017, a copy of the foregoing was served via electronic mail on the following:

United States of America
Clayton Ray Mahaffey – DOJ

US Attorney's Office
801 Cherry Street, Suite 1700
Fort Worth, TX 76102
Clay.mahaffey@usdoj.gov

*/s/ Jay C. English*

# Exhibit 1

**U.S. Securities and Exchange Commission**

## Filing Detail

Search the Next-Generation EDGAR System

SEC Home » Search the Next-Generation EDGAR System » Company Search » *Current Page*

---

**Form 10-K** - Annual report [Section 13 and 15(d), not S-K Item 405]:     SEC Accession No. 0000892569-03-000847

| | |
|---|---|
| **Filing Date** 2003-03-31 | **Period of Report** 2002-12-31 |
| **Accepted** 2003-03-31 14:40:03 | |
| **Documents** 11 | |

---

### Document Format Files

| Seq | Description | Document | Type | Size |
|---|---|---|---|---|
| 1 | FORM 10-K | a88362e10vk.htm | 10-K | 201525 |
| 3 | EXHIBIT 3.2 | a88362exv3w2.txt | EX-3.2 | 45156 |
| 4 | EXHIBIT 10.5 | a88362exv10w5.txt | EX-10.5 | 5703 |
| 5 | EXHIBIT 10.9 | a88362exv10w9.txt | EX-10.9 | 35889 |
| 6 | EXHIBIT 10.13 | a88362exv10w13.txt | EX-10.13 | 16457 |
| 7 | EXHIBIT 10.16 | a88362exv10w16.htm | EX-10.16 | 59462 |
| 8 | EXHIBIT 10.17 | a88362exv10w17.txt | EX-10.17 | 16672 |
| 9 | EXHIBIT 13 | a88362exv13.htm | EX-13 | 841154 |
| 10 | EXHIBIT 21 | a88362exv21.htm | EX-21 | 238200 |
| 11 | EXHIBIT 23 | a88362exv23.txt | EX-23 | 2186 |
| 12 | EXHIBIT 99.1 | a88362exv99w1.txt | EX-99.1 | 1434 |
| | Complete submission text file | 0000892569-03-000847.txt | | 1466493 |

---

### FLUOR CORP (Filer) CIK: 0001124198 (see all company filings)

IRS No.: **330927079** | State of Incorp.: **DE** | Fiscal Year End: **1231**
Type: **10-K** | Act: **34** | File No.: **001-16129** | Film No.: **03629419**
SIC: **1600** Heavy Construction Other Than Bldg Const - Contractors
Assistant Director 6

| Business Address | Mailing Address |
|---|---|
| *ONE ENTERPRISE DR* | *ONE ENTERPRISE DR* |
| *ALISO VIEJO CA 92656* | *ALISO VIEJO CA 92656* |
| *9493492000* | |

10-K 1 a88362e10vk.htm FORM 10-K

**Table of Contents**

# SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

# Form 10-K

(Mark One)

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

 **For the fiscal year ended December 31, 2002**

or

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

 **For the transition period from          to**

### Commission File Number 1-16129

# Fluor Corporation

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Delaware** | **33-0927079** |
| *(State or other jurisdiction of* | *(I.R.S. Employer* |
| *Incorporation or organization)* | *Identification Number)* |
| **One Enterprise Drive,** | **92656** |
| **Aliso Viejo, California** | *(Zip Code)* |
| *(Address of principal executive offices)* | |

### (949) 349-2000

*(Registrant's telephone number, including area code)*

### Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common stock, $.01 par value | New York Stock Exchange |

### Securities registered pursuant to Section 12(g) of the Act:

### None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months, and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑      No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.    ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2).    Yes ☑    No ☐

Based upon the closing price of the registrant's common stock as of June 28, 2002, the aggregate market value of the common stock held by non-affiliates was $3,115,234,749.

As of March 12, 2003, there were 81,183,981 shares of Fluor common stock outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Parts I, II and IV incorporate certain information by reference from the registrant's Annual Report to shareholders for the fiscal year ended December 31, 2002.

Part III incorporates certain information by reference from the registrant's definitive proxy statement for the annual meeting of shareholders to be held on May 7, 2003, which proxy statement will be filed no later than 120 days after the close of the registrant's fiscal year ended December 31, 2002.

PART I
    Item 1. Business
    Item 2. Properties
    Item 3. Legal Proceedings
    Item 4. Submission of Matters to a Vote of Security Holders
PART II
    Item 5. Market for Registrant's Common Equity and Related Stockholder Matters
    Item 6. Selected Financial Data
    Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations
    Item 7A. Quantitative and Qualitative Discussions about Market Risk
    Item 8. Financial Statements and Supplementary Data
    Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
PART III
    Item 10. Directors and Executive Officers of the Registrant
    Item 11. Executive Compensation
    Item 12. Security Ownership of Certain Beneficial Owners and Management and Related
    Stockholder Matters
    Item 13. Certain Relationships and Related Transactions
PART IV
    Item 14. Controls and Procedures
    Item 15. Exhibits, Financial Statement Schedules and Reports on Form 8-K
SIGNATURES
CERTIFICATIONS
EXHIBIT INDEX
EXHIBIT 3.2
EXHIBIT 10.5
EXHIBIT 10.9
EXHIBIT 10.13
EXHIBIT 10.16
EXHIBIT 10.17
EXHIBIT 13
EXHIBIT 21
EXHIBIT 23
EXHIBIT 99.1

**Table of Contents**

Fluor also provides engineering and construction services, as well as contingency operations support to the Departments of Defense, State and Transportation and to agencies such as the Federal Emergency Management Agency. We received an award in the second quarter award to provide construction services for the U.S. Ground-Based Missile Defense Facilities in Alaska. Our contingency operations activities, which support military logistical and infrastructure needs around the world, are evidenced by our recent U.S. Airforce task order to upgrade airports in Afghanistan with radar and runway lighting.

In January 2003, we acquired Del-Jen, Inc., a leading provider of outsourced services to the federal government. Del-Jen provides operations and maintenance services at military bases and education and training services to the Department of Labor, particularly through its Job Corps programs.

### Discontinued Coal Segment

During fiscal 2000, the Coal segment, which operated through A. T. Massey Coal Company, Inc. and its subsidiaries, was headquartered in Richmond, Virginia. As a result of the Distribution, on November 30, 2000, the Coal segment ceased to be part of our continuing operations and reported results, and is now reported as a discontinued operation. The Coal segment, now operated by Massey, is a publicly-traded Company that is listed on the New York Stock Exchange, and files reports with the Securities and Exchange Commission.

### Other Matters

**Backlog**

The following table sets forth the consolidated backlog of the Energy and Chemicals, Industrial and Infrastructure, Power, Global Services and Government Services segments at December 31, 2002 and 2001.

|                              | December 31, 2002 | December 31, 2001 |
|------------------------------|------------------:|------------------:|
|                              | (in millions)     |                   |
| Energy and Chemicals         | $2,385            | $ 3,823           |
| Industrial and Infrastructure| 4,133             | 2,959             |
| Power                        | 841               | 2,256             |
| Global Services              | 1,555             | 1,860             |
| Government Services          | 795               | 608               |
| Total                        | $9,709            | $11,506           |

The following table sets forth the consolidated backlog the Energy and Chemicals, Industrial and Infrastructure, Power, Global Services and Government Services segments at December 31, 2002 and 2001 by region.

|                                | December 31, 2002 | December 31, 2001 |
|--------------------------------|------------------:|------------------:|
|                                | (in millions)     |                   |
| United States                  | $5,608            | $ 7,515           |
| Asia Pacific (Including Australia)| 712             | 219               |
| Europe, Africa and Middle East | 1,570             | 1,625             |
| The Americas                   | 1,819             | 2,147             |
| Total                          | $9,709            | $11,506           |

Estimated portion not to be performed during 2003: 30%.

**Exhibit 21**

# FLUOR CORPORATION SUBSIDIARIES[1]

[Note: Roman numerals below denote the level of the subsidiary. For example, "I" represents a first tier subsidiary of Fluor Corporation; "II" represents a second tier subsidiary, etc.]

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| **I American Equipment Company, Inc.** | 100.0000 | South Carolina |
| II AMECO Services Inc. | 100.0000 | Delaware |
| III AMEC Equipment Leasing SARL | 100.0000 | France |
| II Ameco Services, S. de R.L. de C.V. | 72.6016 | Mexico |
| II American Construction Equipment Company, Inc. | 100.0000 | California |
| III AMECO Contractors Rentals, Inc. | 100.0000 | Philippines |
| III AMECO Holdings, Inc. | 100.0000 | California |
| IV AMECO Caribbean, Inc. | 100.0000 | California |
| IV Ameco Mexico Administracion y Servicios, S. de R.L. de C.V. | 0.2000 | Mexico |
| IV Ameco Mining Services S.R.L. | 99.0000 | Argentina |
| IV Ameco Peru S.A.C. | 0.8357 | Peru |
| IV AMECO Project Services, Inc. | 100.0000 | Philippines |
| IV Ameco Pty Ltd. | 100.0000 | Australia |
| IV Ameco Services S.R.L. | 99.0000 | Argentina |
| IV Ameco Services, S. de R.L. de C.V. | 3.0992 | Mexico |
| IV American Equipamentos do Brasil Ltda. | 1.0000 | Brazil |
| III Ameco Mexico Administracion y Servicios, S. de R.L. de C.V | 99.8000 | Mexico |
| III Ameco Mining Services S.R.L. | 1.0000 | Argentina |
| III Ameco Peru S.A.C. | 99.1643 | Peru |
| III Ameco Services S.R.L. | 1.0000 | Argentina |
| III Ameco Services, S. de R.L. de C.V. | 24.2992 | Mexico |
| III American Equipamentos do Brasil Ltda. | 99.0000 | Brazil |
| II GlobEquip LLC | 100.0000 | Delaware |
| II J. W. Burress, Incorporated | 100.0000 | Virginia |
| II S & R Equipment Co., Inc. | 100.0000 | Ohio |
| II SMA Equipment Co., Inc. | 100.0000 | Delaware |
| II SMA Information Systems Inc. | 100.0000 | Delaware |
| II South Carolina Commercial, LLC | 100.0000 | South Carolina |
| **I Fluor Constructors International, Inc.** | 100.0000 | California |
| II Fluor Constructors Canada Ltd. | 100.0000 | New Brunswick |
| II Fluor Constructors Indiana Limited Partnership | 1.0000 | Indiana |
| II Fluor Constructors Indonesia, Inc. | 100.0000 | California |
| II Fluor Management and Technical Services, Inc. | 100.0000 | California |
| III Fluor Constructors Indiana Limited Partnership | 99.0000 | Indiana |
| **I Fluor Enterprises, Inc.** | 100.0000 | California |
| II ADP Marshall, Inc. | 100.0000 | Arizona |
| III ADP Marshall Contractors, Inc. | 100.0000 | Delaware |
| III ADP Marshall Limited | 100.0000 | Ireland |
| III ADP/FD of Nevada, Inc. | 100.0000 | Nevada |
| III ADPM, L.L.C. | 100.0000 | Delaware |
| II Caribbean Thermal Electric, LLC | 49.0000 | Delaware |
| II CFP International Limited | 100.0000 | Hong Kong |
| II CFP Limited | 100.0000 | Hong Kong |
| II Claiborne Fuels, Inc. | 100.0000 | California |
| III Claiborne Fuels, L.P. | 1.0000 | Delaware |
| II Daniel International Corporation | 100.0000 | South Carolina |

1

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| III Daniel Navarra, S.A. | 100.0000 | Spain |
| III Fluor Daniel Engineering, Inc. | 100.0000 | Ohio |
| III Fluor Management Company L.P. | 46.0676 | Delaware |
| II DAX Industries, Inc. | 5.0000 | Texas |
| II Duke/Fluor Daniel | 49.9999 | North Carolina |
| II Efdee Connecticut Architects, Inc. | 100.0000 | Connecticut |
| II Efdee Engineering Corporation | 100.0000 | North Carolina |
| II Efdee Mississippi Architects, A Professional Corporation | 100.0000 | Mississippi |
| II Efdee New York Engineers & Architects P.C. | 100.0000 | New York |
| II Encee Architecture Services, P.C. | 100.0000 | North Carolina |
| II ESSI, LLC | 33.3333 | Delaware |
| III ESSI Limited | 100.0000 | England |
| II eTech Solutions, Inc. | 100.0000 | Nevada |
| II Evergreen Equipment and Personnel Leasing, Inc. | 100.0000 | Rhode Island |
| II F&F Infrastructure, LLC | 50.0000 | Colorado |
| II FD Architects & Engineers Corporation | 100.0000 | New Jersey |
| II FD Mexico, Inc. | 100.0000 | Delaware |
| II FD/MK Limited Liability Company | 60.0000 | Delaware |
| II FDEE Consulting, Inc. | 100.0000 | California |
| II FDHM, Inc. | 100.0000 | California |
| II Fluor (Nigeria) Limited | 100.0000 | Nigeria |
| II Fluor A&E Services, Inc. | 100.0000 | California |
| II Fluor Abadan Limited | 100.0000 | Bermuda |
| II Fluor Alaska, Inc. | 100.0000 | Alaska |
| II Fluor Ames Kraemer, LLC | 40.0000 | Delaware |
| II Fluor Atlantic Limited | 100.0000 | Bermuda |
| II Fluor Australia Pty Ltd | 100.0000 | Australia |
| III Civil and Mechanical Maintenance Pty. Ltd. | 100.0000 | Australia |
| III Fluor Daniel (Qld) Pty. Ltd. | 100.0000 | Australia |
| III Fluor Daniel Constructors Pty. Ltd. | 100.0000 | Australia |
| III Fluor Global Services Australia Pty Ltd | 100.0000 | Australia |
| IV Fluor Maintenance Services Pty Ltd | 100.0000 | Australia |
| IV Fluor Operations and Maintenance Services Pty Ltd | 100.0000 | Australia |
| IV Fluor Services Pty Ltd | 100.0000 | Australia |
| III Karratha Engineering Services Pty Ltd | 100.0000 | Australia |
| III Signet Holdings Pty Ltd | 100.0000 | Australia |
| IV PT Signet Indonesia | 90.0000 | Indonesia |
| IV Signet Engineering Pty Ltd | 100.0000 | Australia |
| V Signet Ingenieria S.A. | 0.0100 | Chile |
| VI Constructora Lequena S.A. | 100.0000 | Chile |
| IV Signet Ingenieria S.A. | 99.9900 | Chile |
| V Constructora Lequena S.A. | 100.0000 | Chile |
| IV Signet International Holdings Pty. Ltd. | 100.0000 | Australia |
| IV Tengis Design Services Pty Ltd | 100.0000 | Australia |
| IV Westquip Australia Pty Ltd | 100.0000 | Australia |
| III TRS Staffing Solutions (Australia) Pty Ltd | 100.0000 | Australia |
| IV AmBit Technology Pty Ltd. | 100.0000 | Australia |
| II Fluor Canada Ltd. | 100.0000 | New Brunswick |
| III Fluor Daniel International Services Inc. | 10.0000 | Barbados |
| III Fluor Daniel Wright Ltd. | 100.0000 | New Brunswick |
| IV Wright Engineers (Chile) Limitada | 95.0000 | Chile |
| IV Wright Engineers Limitada Peru | 35.0000 | Peru |
| III TRS Staffing Solutions (Canada) Inc. | 100.0000 | Canada |
| III Wright Engineers (Chile) Limitada | 5.0000 | Chile |
| II Fluor Chile, Inc. | 100.0000 | California |

2

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| III Ameco Chile S.A. | 99.0000 | Chile |
| III Fluor Daniel Chile Ingenieria y Construccion S.A. | 99.0000 | Chile |
| IV Jaakko-Poyry – Fluor Daniel Chile SA | 75.0000 | Chile |
| III Ingenieria y Construcciones Fluor Daniel Chile Limitada | 99.1000 | Chile |
| II Fluor Colombia Limited | 100.0000 | Delaware |
| II Fluor Continental Limited | 100.0000 | Bermuda |
| II Fluor Daniel (Japan) Inc. | 100.0000 | Japan |
| II Fluor Daniel (Malaysia) Sdn. Bhd. | 100.0000 | Malaysia |
| II Fluor Daniel (NPOSR), Inc. | 100.0000 | Delaware |
| II Fluor Daniel Alumatech, Inc. | 100.0000 | Delaware |
| II Fluor Daniel America, Ltda. | 100.0000 | California |
| II Fluor Daniel Brasil, Ltda. | 99.9983 | Brazil |
| II Fluor Daniel Caribbean, Inc. | 100.0000 | Delaware |
| III DMIS, Inc. | 100.0000 | South Carolina |
| III Duke/Fluor Daniel Caribbean, S.E. | 0.2500 | Puerto Rico |
| III Fluor Daniel Export Services, Inc. | 100.0000 | Delaware |
| III Fluor Daniel International (Malaysia) Sdn. Bhd. | 100.0000 | Malaysia |
| III Fluor Daniel Maintenance Services, Inc. | 100.0000 | Delaware |
| III Fluor Daniel Services Corporation | 100.0000 | Delaware |
| III Fluor Egypt | 50.0000 | Egypt |
| III Fluor Facility & Plant Services, Inc. | 100.0000 | South Carolina |
| II Fluor Daniel China, Inc. | 100.0000 | California |
| II Fluor Daniel China Services, Inc. | 100.0000 | California |
| II Fluor Daniel China Technology, Inc. | 100.0000 | California |
| II Fluor Daniel Coal Services International, Inc. | 100.0000 | Delaware |
| III Duke/Fluor Daniel International | 49.9999 | Nevada |
| IV D/FD Foreign Sales Corporation | 75.0000 | Barbados |
| IV Duke/Fluor Daniel Caribbean, S.E. | 99.0000 | Puerto Rico |
| III Duke/Fluor Daniel LLC | 49.9999 | Nevada |
| III Duke/Fluor Pty Ltd | 50.0000 | Australia |
| II Fluor Daniel Construction Company | 100.0000 | California |
| II Fluor Daniel Development Corporation | 100.0000 | California |
| III Crown Energy Company | 100.0000 | New Jersey |
| III Fluor Daniel Modesto, Inc. | 100.0000 | California |
| IV Wilmore/Fluor Modesto LLC | 50.0000 | California |
| III Fluor Daniel Temecula, Inc. | 100.0000 | California |
| IV Fluor Daniel Ada, Inc. | 50.0000 | Idaho |
| III Fluor Daniel Tempe, Inc. | 100.0000 | California |
| IV Fluor Daniel Ada, Inc. | 50.0000 | Idaho |
| III Gloucester Limited, Inc. | 100.0000 | California |
| III Gloucester Limited II, Inc. | 100.0000 | California |
| III San Diego Expressway L.P. | 3.9300 | California |
| III Tarrant Energy, Inc. | 100.0000 | California |
| II Fluor Daniel Eastern, Inc. | 100.0000 | California |
| III P.T. Fluor Daniel Indonesia | 80.0000 | Indonesia |
| IV PT. AMECO Servicindo | 99.0000 | Indonesia |
| II Fluor Daniel Energy Investments, Inc. | 100.0000 | Delaware |
| III The Beacon Group Energy Investment Fund, L.P. | 7.0700 | Delaware |
| II Fluor Daniel Engineers & Constructors, Inc. | 100.0000 | Delaware |
| III Davy Kinhill Fluor Daniel (PNG) Pty Ltd. | 38.0000 | Papua N. Guinea |
| III Fluor Daniel Project Consultants (Shenzhen) Co., Ltd. | 100.0000 | P.R.C. |
| II Fluor Daniel Engineers & Constructors, Ltd. | 100.0000 | California |
| II Fluor Daniel Engineers & Consultants Ltd. | 100.0000 | Mauritius |
| III Fluor Daniel India Private Limited | 80.0000 | India |
| II Fluor Daniel Environmental Strategies, Inc. | 100.0000 | Delaware |
| II Fluor Daniel Espana, S.A. | 100.0000 | California |
| III Daniel International (Saudi Arabia) Ltd. | 50.0000 | Saudi Arabia |
| III Fluor Arabia Limited | 50.0000 | Saudi Arabia |

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| II Fluor Daniel Europe B.V. | 100.0000 | Netherlands |
| III ASI Advanced Solutions International BV | 5.0000 | Netherlands |
| IV ASI Consulting Italy S.r.l. | 100.0000 | Italy |
| IV ASI Consulting UK Limited | 100.0000 | England |
| IV ASI International Services Limited | 100.0000 | England |
| III Fluor Daniel Belgium, N.V. | 100.0000 | Belgium |
| III Fluor Daniel B.V. | 100.0000 | Netherlands |
| IV Fluor Daniel Consultants B.V. | 100.0000 | Netherlands |
| IV Fluor Daniel Engineering and Construction Services Limited | 100.0000 | Turkey |
| IV Fluor Infrastructure B.V. | 100.0000 | Netherlands |
| V Infraspeed Holdings B.V. | 7.1000 | Netherlands |
| VI Infraspeed B.V. | 100.0000 | Netherlands |
| V Infraspeed Maintenance B.V. | 11.0000 | Netherlands |
| V Infraspeed EPC Consortium V.O.F. | 8.9000 | Netherlands |
| IV International Refinery Contractors B.V. | 50.0000 | Netherlands |
| IV Prochem S.A. | 9.0000 | Poland |
| IV TRS Staffing Solutions B.V. | 100.0000 | Netherlands |
| III Fluor Daniel E&C LLC | 100.0000 | Russia |
| III Fluor Daniel Eastern Services B.V. | 100.0000 | Netherlands |
| III Fluor Daniel, S.A. | 3.9200 | Spain |
| III Prosynchem Sp.z.o.o. | 98.6562 | Poland |
| II Fluor Daniel Florida Rail, Inc. | 100.0000 | Delaware |
| II Fluor Daniel Global Limited | 100.0000 | Guernsey |
| III Fluor Daniel Global Contracting Limited | 100.0000 | Guernsey |
| III Fluor Daniel Global Placement Limited | 100.0000 | Guernsey |
| III Fluor Daniel Global Placement Services Limited | 100.0000 | Guernsey |
| III Fluor Daniel Global Services Limited | 100.0000 | Guernsey |
| III Fluor Daniel Global Support Services Limited | 100.0000 | Guernsey |
| III Fluor Daniel Global TRS Limited | 100.0000 | Guernsey |
| III Fluor Daniel Global TRS Services Limited | 100.0000 | Guernsey |
| II Fluor Daniel GmbH | 100.0000 | Germany |
| II Fluor Daniel Holdings, Inc. | 100.0000 | California |
| III Fluor Daniel Global Services Private Limited | 100.0000 | India |
| II Fluor Daniel Illinois, Inc. | 100.0000 | Delaware |
| III Duke/Fluor Daniel | 49.9999 | North Carolina |
| IV D/FD Enterprises, LLC | 100.0000 | Delaware |
| IV D/FD Equipment Company LLC | 100.0000 | Delaware |
| IV D/FD Grays Harbor, LLC | 100.0000 | Delaware |
| IV D/FD Kentucky Mountain Power, LLC | 100.0000 | Delaware |
| IV D/FD Operating Plant Services, LLC | 100.0000 | Delaware |
| IV D/FD Plant Services, LLC | 100.0000 | Delaware |
| IV D/FD Ventures, LLC | 100.0000 | Delaware |
| IV Turbine Fleet Management, LLC | 100.0000 | Delaware |
| III Fluor Iran | 9.8000 | Iran |
| II Fluor Daniel India, Inc. | 100.0000 | California |
| II Fluor Daniel Indiana Limited Partnership | 1.0000 | Indiana |
| II Fluor Daniel Intercontinental, Inc. | 100.0000 | California |
| III Dominican Republic Combined Cycle, LLC | 49.0000 | Delaware |
| III Fluor Daniel Brasil, Ltda. | 0.0017 | Brazil |
| III Fluor Daniel Nigeria Limited | 60.0000 | Nigeria |
| III Fluor Iran | 9.8000 | Iran |
| III Grupo Alvica SCS | 79.9200 | Venezuela |
| III NWKC LLC | 50.0000 | Delaware |
| II Fluor Daniel International Services Inc. | 90.0000 | Barbados |
| II Fluor Daniel Ireland Limited | 100.0000 | Ireland |

4

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| III Fluor Daniel – E-E-L Limited | 50.0000 | Ireland |
| II Fluor Daniel Latin America, Inc. | 100.0000 | California |
| III Grupo Alvica USA, LLC | 80.0000 | Delaware |
| III Grupo Empresarial Alvica, S.A. | 80.0000 | Venezuela |
| IV Grupo Alvica, SCS | 0.1000 | Venezuela |
| III Servicios Cuyuni, E.T.T., C.A. | 80.0000 | Venezuela |
| II Fluor Daniel Mexico S.A. | 100.0000 | California |
| III ICA-Fluor Daniel, S. de R.L. de C.V. | 49.0000 | Mexico |
| III TRS International Group, S. de R.L. de C.V. | 0.0954 | Mexico |
| II Fluor Daniel Mining & Metals, Ltd. | 100.0000 | California |
| III Ameco Chile S.A. | 1.0000 | Chile |
| III Fluor Daniel Chile Ingenieria y Construccion S.A. | 1.0000 | Chile |
| IV Jaakko-Poyry – Fluor Daniel Chile SA | 75.0000 | Chile |
| III Ingenieria y Construcciones Fluor Daniel Chile Limitada | 0.9000 | Chile |
| II Fluor Daniel Overland Express, Inc. | 100.0000 | Delaware |
| II Fluor Daniel Overseas, Inc. | 100.0000 | California |
| III Arctic Pacific Contractors International, L.L.C. | 50.0000 | Delaware |
| III PFD International LLC | 50.0000 | Delaware |
| II Fluor Daniel P.R.C., Ltd. | 100.0000 | California |
| II Fluor Daniel Pacific, Inc. | 100.0000 | California |
| III Fluor Daniel-AMEC Philippines, Inc. | 50.0000 | Philippines |
| II Fluor Daniel Power B.V. | 100.0000 | Netherlands |
| III Duke/Fluor Daniel B.V. | 50.0000 | Netherlands |
| II Fluor Daniel Properties Limited | 100.0000 | England |
| II Fluor Daniel Pulp & Paper, Inc. | 100.0000 | California |
| III Fluor Daniel Indiana Limited Partnership | 99.0000 | Indiana |
| II Fluor Daniel Real Estate Services, Inc. | 100.0000 | South Carolina |
| II Fluor Daniel Sales Corporation | 100.0000 | Barbados |
| II Fluor Daniel South America Limited | 100.0000 | California |
| II Fluor Daniel South East Asia, Ltd. | 100.0000 | California |
| II Fluor Daniel Technical Services, Inc. | 100.0000 | Texas |
| II Fluor Daniel Telecommunications Corporation | 100.0000 | California |
| II Fluor Daniel Thailand Holdings Corporation | 100.0000 | California |
| III Fluor Iran | 9.8000 | Iran |
| II Fluor Daniel Thailand, Ltd. | 100.0000 | California |
| II Fluor Daniel Transportation, Inc. | 100.0000 | Washington |
| II Fluor Daniel Venture Group, Inc. | 100.0000 | California |
| III Fluor Daniel Asia, Inc. | 100.0000 | California |
| IV Duke/Fluor Daniel International Services | 49.9999 | Nevada |
| V D/FD Foreign Sales Corporation | 25.0000 | Barbados |
| V D/FD International Services Brazil Ltda. | 100.0000 | Brazil |
| V Duke/Fluor Daniel Caribbean, S.E. | 0.50000 | Puerto Rico |
| V Duke/Fluor Daniel International Services (Trinidad) Limited | 100.0000 | Trinidad |
| IV P.T. Fluor Daniel Indonesia | 20.0000 | Indonesia |
| V P.T. AMECO Servicindo | 99.0000 | Indonesia |
| IV P.T. Nusantara Power Services | 40.0000 | Indonesia |
| III Micogen Inc. | 100.0000 | California |
| III Micogen Limited I, Inc. | 100.0000 | California |
| III Micogen Limited II, Inc. | 100.0000 | California |
| III Soli-Flo LLC | 25.0000 | Delaware |
| IV Soli-Flo, Inc. | 100.0000 | California |
| V Soli-Flo Material Transfer, L.P. | 1.0000 | California |
| V Soli-Flo Partners, L.P. | 1.0000 | California |
| III Soli-Flo Material Transfer, L.P. | 24.7500 | California |
| III Soli-Flo Partners, L.P. | 24.7500 | California |

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| III Springfield Resource Recovery, Inc. | 100.0000 | Mass. |
| II Fluor Daniel, a Professional Architectural Corporation | 100.0000 | Louisiana |
| II Fluor Daniel, Inc. – Philippines | 100.0000 | Philippines |
| II Fluor Daniel, S.A. | 96.0000 | Spain |
| II Fluor Distribution Companies, Inc. | 100.0000 | California |
| II Fluor Egypt | 50.0000 | Egypt |
| II Fluor Engineering Corporation | 100.0000 | Michigan |
| II Fluor Engineers, Inc. | 100.0000 | Delaware |
| II Fluor Enterprises Group, Inc. | 100.0000 | Delaware |
| II Fluor Federal Services, Inc. | 100.0000 | Washington |
| II Fluor Federal Services, LLC | 100.0000 | Delaware |
| III Alutiiq Federal Services Limited Liability Company | 49.0000 | Alaska |
| III Fluor Hawaii, LLC | 100.0000 | Hawaii |
| II Fluor Federal Services NWS, Inc. | 100.0000 | Washington |
| II Fluor Fernald, Inc. | 100.0000 | California |
| III Fluor Environmental Resources Management Services, Inc. | 100.0000 | Delaware |
| II Fluor Gulf Communications, Inc. | 100.0000 | California |
| II Fluor Hanford, Inc. | 100.0000 | Washington |
| II Fluor Indonesia, Inc. | 100.0000 | California |
| II Fluor Industrial Services, Inc. | 100.0000 | Delaware |
| II Fluor International Limited | 100.0000 | Bermuda |
| II Fluor International Limited | 100.0000 | England |
| III Aptech Fluor Daniel (Private) Limited | 50.0000 | Zimbabwe |
| III Arctic Pacific Contractors (UK) Limited | 50.0000 | England |
| III ASI Advanced Solutions International BV | 95.0000 | Netherlands |
| IV ASI Consulting Italy S.r.l. | 100.0000 | Italy |
| IV ASI Consulting UK Limited | 100.0000 | England |
| IV ASI International Services Limited | 100.0000 | England |
| III Citylink Telecommunications Holdings Limited | 18.0000 | England |
| IV Citylink Telecommunications Limited | 100.0000 | England |
| III David Chorley Associates Limited | 100.0000 | England |
| III First Legal Recruitment Limited | 100.0000 | England |
| III First Accountancy Limited | 100.0000 | England |
| III First Recruitment Limited | 100.0000 | England |
| III Fluor Daniel Caspian Services Limited | 100.0000 | England |
| III Fluor Industrial Services Limited | 100.0000 | England |
| IV Team-Sel International Limited | 99.9999 | England |
| V TA Engineering Services (Tunisia) Limited | 100.0000 | England |
| V TA Engineering Services Limited | 99.9950 | England |
| III Fluor Limited | 100.0000 | England |
| III Fluor Ocean Services Limited | 100.0000 | England |
| III KDPC Limited | 50.0000 | England |
| III PFD (UK) Limited | 50.0000 | England |
| III TA Engineering Services Limited | 0.0050 | England |
| III Team-Sel International Limited | 0.0001 | England |
| IV TA Engineering Services (Tunisia) Limited | 100.0000 | England |
| IV TA Engineering Services Limited | 99.9950 | England |
| III TRS Management Resources PLC | 100.0000 | England |
| IV Ambit Technology Limited | 100.0000 | England |
| IV Antony Dunlop Associates Limited | 100.0000 | England |
| IV MRG Human Resources Limited | 100.0000 | England |
| IV SAP Services Limited | 100.0000 | England |
| IV Times Computer Services Limited | 100.0000 | England |
| IV TRS Management Resources (Services) Ltd. | 100.0000 | England |
| V Hotel Accounts Resources Limited | 100.0000 | England |

6

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| V Times Group Limited | 100.0000 | England |
| III TRS Staffing Solutions (U.K.) Limited | 100.0000 | England |
| II Fluor International, Inc. | 100.0000 | California |
| III Fluor Mideast Limited | 100.0000 | California |
| II Fluor Iran | 70.6000 | Iran |
| II Fluor Maintenance Services, Inc. | 100.0000 | California |
| III Norfolk Maintenance Corporation | 100.0000 | California |
| II Fluor Mideast Limited | 100.0000 | Bermuda |
| II Fluor Nuclear Services, Inc. | 100.0000 | Ohio |
| II Fluor Plant Services International Ltd. | 100.0000 | Bermuda |
| III Fluor International Nigeria Limited | 60.0000 | Nigeria |
| II Fluor Plant Services International, Inc. | 100.0000 | California |
| II Fluor Real Estate Services, Inc. | 100.0000 | Delaware |
| II Fluor Reinsurance Investments, Inc. | 100.0000 | Delaware |
| II Fluor Services International, Inc. | 100.0000 | Nevada |
| II Fluor Technical Services Limited | 100.0000 | California |
| II Fluor Texas, Inc. | 100.0000 | Texas |
| II Fluor US Services, Inc. | 100.0000 | Delaware |
| II FMC Holding Company LLC | 100.0000 | Delaware |
| III Fluor Management Company L.P. | 20.5277 | Delaware |
| II FRES, Inc. | 100.0000 | Delaware |
| II Fru-Con/Fluor Daniel Joint Venture | 50.0000 | Missouri |
| II Indo-Mauritian Affiliates Limited | 100.0000 | Mauritius |
| III Fluor Daniel India Private Limited | 20.0000 | India |
| II Lone Star Infrastructure, LLC | 40.0000 | Delaware |
| II Micogen Limited III, Inc. | 100.0000 | California |
| III Claiborne Fuels, L.P. | 99.0000 | Delaware |
| II Middle East Fluor | 100.0000 | California |
| II Nutmeg Valley Resources, Inc. | 100.0000 | California |
| II Platte River Constructors, Ltd. | 49.0000 | Ohio |
| II Power Maintenance Services, Inc. | 100.0000 | Delaware |
| III D/FD Bridgeport Operations, LLC | 49.9999 | Delaware |
| III D/FD Cokenergy Operations, LLC | 49.9999 | Delaware |
| III D/FD Operating Services, LLC | 49.9999 | Delaware |
| III DFD California Operations | 49.0000 | California |
| II Saddleback Constructors | 27.0000 | Delaware |
| II Signet Technology Inc. | 100.0000 | Colorado |
| II Soli-Flo LLC | 25.0000 | Delaware |
| III Soli-Flo, Inc. | 100.0000 | California |
| IV Soli-Flo Material Transfer, L.P. | 1.0000 | California |
| IV Soli-Flo Partners, L.P. | 1.0000 | California |
| II Soli-Flo Material Transfer, L.P. | 24.7500 | California |
| II Soli-Flo Partners, L.P. | 24.7500 | California |
| II Stanhope Management Services Limited | 100.0000 | England |
| II Strategic Organizational Systems Enterprises, Inc. | 100.0000 | California |
| III Strategic Organizational Systems Construction Division, Inc. | 100.0000 | California |
| III Strategic Organizational Systems Environmental Division, Inc. | 100.0000 | Oklahoma |
| III Strategic Organizational Systems Environmental Division, Inc. | 100.0000 | Louisiana |
| III Strategic Organizational Systems Environmental Engineering Division, Inc. | 100.0000 | Texas |
| IV SOS International, Inc. | 100.0000 | Alabama |
| IV Strategic Organizational Systems Environmental Engineering California Division, Inc. | 100.0000 | California |
| III Strategic Organizational Systems Southern California Division, Inc. | 100.0000 | California |
| II TDF, Inc. | 100.0000 | California |
| III Barringford Ltd. | 100.0000 | B. Virgin Isles |

https://www.sec.gov/Archives/edgar/data/1124198/000101706202000439/dex21.htm      8/9

| Subsidiary Name | Percent Holding | Organized Under Laws Of |
|---|---|---|
| IV Bishopsford Engineering AG | 100.0000 | Switzerland |
| IV Fluor Daniel Engineers SA (PTY) Ltd. | 100.0000 | Liechtenstein |
| V Trans-Africa Projects Ltd. | 50.0000 | Mauritius |
| V Trans-Africa Projects (Pty) Ltd. | 50.0000 | R. South Africa |
| IV Fluor Daniel SA (PTY) Ltd. | 100.0000 | Liechtenstein |
| V Fluor Global Plant Services (Proprietary) Ltd. | 100.0000 | R. South Africa |
| V Rhus Investments (PTY) Ltd. | 100.0000 | R. South Africa |
| IV Rama Engineering Services B.V. | 100.0000 | Netherlands |
| V Ramasa (PTY) Ltd. | 100.0000 | R. South Africa |
| IV TRS Staffing Solutions SA (Pty) Ltd. | 100.0000 | B. Virgin Isles |
| III Fluor Properties (PTY) Ltd. | 100.0000 | R. South Africa |
| II TradeMC Inc. | 82.0000 | Delaware |
| III TradeMC Ltd. | 100.0000 | Canada |
| II TRS Contract Solutions, Inc. | 100.0000 | Delaware |
| II Valley Corridor Constructors | 30.0000 | Colorado |
| II Valley Infrastructure Group, LLC | 40.0000 | Delaware |
| II Venezco, Inc. | 100.0000 | California |
| II Williams Brothers Engineering Company | 100.0000 | Delaware |
| III Fluor Daniel Argentina, Inc. | 100.0000 | Delaware |
| III Williams Brothers Engineering Limited | 100.0000 | England |
| III Williams Brothers Engineering Pty Ltd | 100.0000 | Australia |
| III Williams Brothers Process Services, Inc. | 100.0000 | Delaware |
| II Wireless Engineering Services Group, LLC | 50.0000 | Delaware |
| II WODECO Nigeria Limited | 60.0000 | Nigeria |
| **I Fluor Holding Company LLC** | 100.0000 | Delaware |
| II Compania Mineria San Jose Del Peru S.A. | 99.0000 | Peru |
| II Fluor Management Company L.P. | 33.4047 | Delaware |
| II Global Builders Insurance Ltd. | 100.0000 | Bermuda |
| II Mineral Resource Development Corporation | 100.0000 | Delaware |
| III Compania Mineria San Jose Del Peru S.A. | 1.0000 | Peru |
| III St. Joe ErzbergbauGesellschaft GmbH | 16.6667 | Austria |
| III St. Joe Minerals Corporation y Cia. | 0.0125 | Brazil |
| II Pinnacle Insurance Company, Inc. | 100.0000 | Hawaii |
| II Robil International Corporation | 100.0000 | Delaware |
| II St. Joe Egypt Exploracion Corp. | 100.0000 | Delaware |
| II St. Joe ErzbergbauGesellschaft GmbH | 83.3333 | Austria |
| II St. Joe Exploracion Minera, Inc. | 100.0000 | Delaware |
| II St. Joe Luisito de Oro, Inc. | 100.0000 | Delaware |
| II St. Joe Minerals Corporation y Cia. | 99.9875 | Brazil |
| **I TRS Staffing Solutions, Inc.** | 100.0000 | South Carolina |
| II Ambit Technology, Inc. | 100.0000 | N. Hampshire |
| II Corico Office Professionals, Inc. | 100.0000 | N. Hampshire |
| II TRS International Group, Inc. | 100.0000 | Delaware |
| III TRS International Group, S. de., R.L. de C.V. | 99.9046 | Mexico |
| II TRS International Group Asia Pacific, Inc. | 100.0000 | California |
| II TRS International Payroll Co. | 100.0000 | Texas |
| II TRS Management Resources, Inc. | 100.0000 | South Carolina |
| II TRS Payroll Services, Inc. | 100.0000 | Delaware |

(1)  Does not include certain subsidiaries which if considered in the aggregate as a single subsidiary, would not  constitute a significant subsidiary

8

Exhibit 2



OFFICE OF JOB CORPS



# PERFORMANCE AUDIT OF DEL-JEN, INCORPORATED JOB CORPS CENTERS

Date:   November 3, 2009
Report:   26-10-001-01-370

**PAGE INTENTIONALLY LEFT BLANK**

**PAGE INTENTIONALLY LEFT BLANK**

U. S. Department of Labor -- Office of Inspector General

**PAGE INTENTIONALLY LEFT BLANK**

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a sufficient basis for our findings and conclusions based on our audit objectives. Our audit scope, methodology, and criteria are detailed in Appendix B.

## RESULTS IN BRIEF

DEL-JEN did not ensure compliance with Job Corps requirements for safety in each of the three areas we reviewed – safety inspections, safety committee meetings, and student misconduct. While at Gainesville, we observed multiple safety- and health-related deficiencies. Gainesville identified some of these deficiencies while performing the center's required weekly and monthly safety inspections, and noted them during monthly Safety and Health Committee meetings. However, the inspections, meetings, and resulting corrective action did not effectively eliminate the deficiencies we observed. We also found that Gainesville did not report significant incidents, such as physical assault, weapons possession, and narcotics possession to Job Corps as required.

Additionally, DEL-JEN did not ensure compliance with Job Corps requirements for reporting performance in each of the four areas we reviewed – Career Technical Training (CTT) completions, General Educational Development (GED)/High School Diploma (HSD) attainment, student Onboard Strength (OBS), and student accountability. For CTT completions, DEL-JEN did not ensure students completed all of the training tasks as required by Job Corps. For GED/HSD attainment, DEL-JEN did not ensure high school diplomas were documented in students' records as required. For student OBS, DEL-JEN did not ensure Gainesville had required support for leave days taken by students immediately prior to separation. For student accountability, DEL-JEN did not ensure Gainesville accurately reported student participation in its off-center Work-Based Learning (WBL) program and did not provide adequate assurance that the participating students were in attendance, or received the intended WBL benefits. In both the CTT and GED/HSD areas, we also identified segregation of duties and system access control weaknesses that need to be corrected.

DEL-JEN generally ensured compliance with Job Corps requirements for managing and reporting financial activity. However, procurement responsibilities for supplies and materials need to be segregated and payroll system access needs to be limited to minimize the risk of error or fraud.

Two of seven hotline complaint allegations had some merit. Those two allegations were (1) an Albuquerque manager inappropriately ordered student medications for personal use, and (2) an Albuquerque staff member inappropriately received dental services. We did not substantiate the other five allegations, all directed to Gainesville —
(3) management intentionally under-ran student recreational services in order to cover discretionary administrative over-runs, and this contributed to a riot at the center;

## RESULTS AND FINDINGS

## Objective 1 – Did DEL-JEN ensure compliance with Job Corps requirements for managing center safety programs?

**Finding 1 – For all three areas reviewed, DEL-JEN did not always ensure compliance with Job Corps requirements for managing center safety and health programs.**

DEL-JEN can improve its oversight to ensure compliance with Job Corps requirements for managing safety and health programs. Gainesville was not always in compliance with Job Corps requirements for safety in all three areas reviewed – safety inspections, safety committee meetings, and student misconduct. While at Gainesville, we observed multiple safety- and health-related deficiencies, including expired food available for use in the cafeteria freezer, dead cockroaches in common areas, and dirty floors in the wellness center. Gainesville did conduct the weekly and monthly safety inspections required by Job Corps and identified some of these deficiencies. However, the inspections and resulting corrective action did not effectively eliminate the deficiencies we observed. Safe and healthy conditions are critical to ensuring students maintain the wellness necessary to participate fully in their training and to maximize their benefit from the program. DEL-JEN was also not able to provide documentation that monthly safety and health committee meetings were consistently conducted at Gainesville during July 2007 through May 2009. We also found that Gainesville did not report significant incidents, such as physical assault, weapons possession, and narcotics possession, as well as less serious behavioral incidents to Job Corps as required. Consequently, this hindered Job Corps' ability to monitor center safety, to ensure significant student misconduct was handled appropriately, and to respond to negative press regarding such incidents.

These deficiencies occurred, in part, because DEL-JEN did not ensure Gainesville established policies and procedures for implementing effective corrective actions over safety inspections, documenting safety committee meetings, and reporting significant and other less serious incidents to Job Corps. In addition, DEL-JEN did not provide adequate monitoring to ensure these required safety program activities were conducted at the center. As a result, there was an increased likelihood that serious safety and health hazards could have existed in the training, living, and working environment that were not identified and corrected at the earliest opportunity.

### Gainesville Safety Inspections Did Not Result In Effective Corrective Action

While we found that Gainesville conducted the weekly and monthly safety inspections required by Job Corps, the inspections and resulting corrective action did not effectively eliminate the deficiencies we observed. We conducted walkthroughs of nine of Gainesville's 13 buildings in June 2009 to observe conditions at the center. These buildings were comprised of (1) administration, education, career technical training, and

actions are also effective and fully implemented are essential tools for management in the maintenance of safe and healthy facilities.

DEL-JEN generally concurred with our conclusion and acknowledged that controls need to be improved. However, they noted the large pile of garbage was an isolated incident due to a change of contractor, and the dead cockroaches were the result of the center's ongoing pest control service.

## Gainesville Was Not in Compliance with Safety Committee Meeting Requirements

PRH Appendix 505 requires centers to establish a Safety and Health Committee to:

- Review reported accidents, injuries, and illnesses;
- Consider the adequacy of actions to prevent recurrence of such accidents, injuries, or illnesses;
- Plan, promote, and implement DOL and Job Corps safety and occupational health programs; and
- Meet monthly and maintain records of the minutes for at least three years.

DEL-JEN was not able to provide documentation that all required monthly Safety and Health Committee meetings were conducted at Gainesville during July 2007 through May 2009. The center did not maintain the required Safety and Health Committee meeting minutes for 12 of the 23 months. These deficiencies occurred, in part, because DEL-JEN had not established Standard Operating Procedures (SOPs) for conducting and documenting the meetings at Gainesville. While Job Corps does not require SOPs for committee meetings, SOPs at Gainesville would have provided center staff with the guidance needed to comply with the Job Corps requirements. Additionally, DEL-JEN corporate and center management did not provide adequate oversight to ensure the committee meetings were held and documented as required. Regular Safety and Health Committee meetings, along with effective inspections and corrective actions, will increase the center's ability to identify and correct safety and health concerns at the earliest opportunity.

DEL-JEN generally concurred with our conclusion and acknowledged that controls need to be improved. In addition, they stated the deficiencies noted were due to poor management of the center's safety and health program.

## Significant Incidents of Student Misconduct Were Not Reported to Job Corps

Gainesville did not take appropriate actions to ensure all significant incidents of student misconduct were reported to Job Corps. The PRH Chapter 5.5 requires centers to report all significant incidents to Job Corps, including:

- Physical   assault;
- Indication that a student is a danger to himself/herself or others;
- Incident involving police involvement;

corrective action to ensure SIRs are reported in a timely manner. Also, the center has implemented a quality control feature in the SIR system by designating a primary and secondary staff member responsible for reporting and documenting SIRs to Job Corps. According to DEL-JEN, the center director will review and audit a SIR summary report monthly to ensure SIRs are reported in a timely manner to Job Corps.

In response to our draft report, both Job Corps and DEL-JEN concurred with our audit results for safety inspections, safety committee meetings, and significant incident reporting. The National Office of Job Corps concurred with our reported findings and recommendations. Job Corps will coordinate with the DEL-JEN Corporate Office to improve corporate-level controls and monitoring over the Gainesville and Albuquerque Job Corps Centers. This will include identifying and correcting any non-compliance issues with Job Corps' safety and health program. DEL-JEN concurred that it can improve its oversight to ensure better compliance with Job Corps requirements for managing center safety and health programs.

## Objective 2 – Did DEL-JEN ensure compliance with Job Corps requirements for reporting performance?

### Finding 2 – For all four areas reviewed, DEL-JEN did not always ensure compliance with Job Corps requirements for reporting performance.

DEL-JEN can improve its centers' performance reporting to Job Corps for all four of the areas we reviewed for Gainesville - CTT completions, student OBS, student accountability, and GED/HSD attainment.

For CTT completions, students at Gainesville did not complete all of the training tasks required by Job Corps. Incomplete tasks could impact a student's ability to obtain and maintain employment in the vocation in which the student was trained. For student OBS, staff at Gainesville did not consistently ensure leave days taken by students immediately prior to separation were supported as required. Documenting approved leave is critical to ensuring students are accounted for. For student accountability, DEL-JEN did not ensure Gainesville accurately reported student participation in its off-center WBL program and did not provide adequate assurance that the participating students were in attendance, or received the intended WBL benefits. For GED/HSD attainment, DEL-JEN did not ensure high school graduations were supported by diplomas or transcripts and certificates as required. In both the CTT and GED/HSD areas, we also identified segregation of duties and system access control weaknesses that need to be corrected.

These deficiencies occurred because DEL-JEN's controls over these areas need improvement. The control weaknesses included inadequate center procedures, staff not following established center procedures, and lack of supervision. Additionally, DEL-JEN's corporate oversight at Gainesville did not effectively address the deficiencies we identified in these areas.

The PRH also stipulated liquidated damages of $750 be assessed for each invalid CTT completion. PRH Chapter 5.1 allows Job Corps discretion when assessing liquidated damages. As such, DEL-JEN may owe DOL $5,250 for the 7 students we identified as having incomplete TARs of the 81 students sampled. Projecting these statistical sample results to the 277 CTT completions reported for PY 2007, we are 90 percent confident that between 12 and 36 of the 277 students did not complete the vocation as required and between $9,000 and $27,000 may be owed to DOL for Gainesville students with incomplete TARs.[2]

Table 2 shows the incomplete TARs we identified at Gainesville and our calculation of potential liquidated damages.

### Table 2 Potential Liquidated Damages Due to PRH TAR Violations

| Vocational Occupation | No. of Students With Incomplete TARs | Liquidated Damages (No. of Students x $750) |
|---|---|---|
| Pantry Cook | 3 | $2,250 |
| Phlebotomy Technician | 2 | $1,500 |
| Carpentry helper | 1 | $750 |
| Nurse Assistant | 1 | $750 |
| Totals 7 | | $5,250 |

The Office of Job Corps stated that it appeared we applied Job Corps policy appropriately, and that our results have led Job Corps to strengthen and clarify current policy that involves the CTT completion issues we identified. During the audit, Job Corps issued revised policy that is intended to ensure students receive the required training while reducing the documentation requirements for CTT completions. Given Job Corps' discretion in assessing liquidated damages, and the new policy, Job Corps needs to determine the amount of liquidated damages DEL-JEN owes the government.

### Segregation of Duties and CIS Access Controls Are Needed for CTT Completions

DEL-JEN did not ensure compliance with internal control standards for segregating the duties of the CTT manager. Government Accountability Office (GAO) Standards for Internal Control in the Federal Government (November 1999) state that key duties and responsibilities need to be divided or segregated among different people to reduce the risk of error or fraud. We found that at least one CTT completion credit was entered in CIS by the CTT manager during PY 2007. This occurred due to a lack of SOPs for segregating the duties of the CTT manager, and may lead to an increased risk of error or fraud since the performance of the CTT manager is linked to the number of CTT credits earned by the center. In response to our finding, DEL-JEN developed an SOP, effective June 22, 2009, to ensure that only the records supervisor and records specialist enter CTT completion credits in CIS.

---

[2]The point estimate is 24 students.

## Table 3 Reasons for PRH Violations

| Leave Type | No. of Exceptions | Reasons for PRH Violations |
|---|---|---|
| PDOF | 4 | Missing interview or appointment documentation |
| Medical Leave | 2 | Missing third party verification |
| WBL | 2 | Missing WBL agreement, signed timecards, or performance evaluations |
| Administrative Leave | 1 | Missing approval signature |

We determined Gainesville retained the 9 students for a total of 183 days in violation of the PRH, which overstated OBS. Gainesville's contract with DOL states that liquidated damages will be assessed for failure to comply with requirements for separating students. DEL-JEN may need to pay a refundable cost to DOL for each day a student is retained in violation of Job Corps requirements. This daily cost for Gainesville during PY 2007 was $9.51. In total, DEL-JEN owes DOL $1,740 (183 days X $9.51) for the 9 students with separation violations we identified during our testing.

This occurred because DEL-JEN did not place adequate emphasis on ensuring that reported leave was properly supported. In addition, during its annual on-site corporate assessment in June 2008, DEL-JEN did not identify any deficiencies in the area of student leave. In fact, DEL-JEN reported a positive observation, indicating that all leave requests had appropriate signatures, and required DEL-JEN leave verification forms were attached.

### WBL Not Supported at Gainesville

Gainesville did not accurately report student participation in the center's off-site WBL program and did not provide adequate assurance that the students were in attendance at their work sites or received the intended WBL program benefits. Job Corps requires students participating in off-center WBL to obtain a written agreement with employers detailing the student-specific provisions required for successful completion and supervisory evaluations providing feedback about the student's performance. Centers are also required to obtain weekly timesheets from employers to ensure students were in attendance at their work sites.

Gainesville provided us with a list of 75 students that participated in off-center WBL during PY 2007. We judgmentally selected 11 of the 75 students and determined that DEL-JEN did not ensure compliance with the Job Corps requirements for WBL. Our results for the 11 student records reviewed are summarized as follows:

- 25 student records did not contain copies of diplomas or transcripts received from SIATech, a public charter high school program that operates out of Gainesville; and
- One student record did not contain a copy of a GED certificate.

We attributed this to a lack of an SOP to ensure academic completions were documented as required. Specifically, the records department did not track the receipt of high school diplomas received from SIATech or any of the online high school programs offered by Gainesville to ensure they were documented in the students' records. Thus, the noted deficiencies occurred because center management reviews of the center's compliance were not conducted. In addition, DEL-JEN did not provide adequate oversight to ensure center staff adhered to PRH requirements. During its June 2008 corporate assessment, DEL-JEN did not identify any weaknesses pertaining to the documentation of academic completions.

Adequate assurance that students graduated from the center's academic programs is not provided when the required supporting documentation is missing. During our audit, Gainesville obtained and provided the OIG with official state certified copies of all missing documentation, including the 25 SIATech high school diplomas and individual transcripts, and the GED certificate.

## Segregation of Duties and CIS Access Controls Are Needed

DEL-JEN did not comply with the GAO internal control standards for segregating the duties of the academic manager. The academic manager entered GED and online HSD completion credits in CIS, and the SIATech principal and registrar entered SIATech high school completion credits in CIS. This occurred due to a lack of SOPs for segregating the duties of the academic manager and SIATech principal and registrar, and may lead to an increased risk of error or fraud since the performance of the academic manager and SIATech principal is linked to the number of academic credits earned by the center. However, nothing came to our attention to indicate HSD completions were overstated. In response to our finding, DEL-JEN developed an SOP, effective June 22, 2009, to ensure that only the records supervisor and records specialist enter both GED and HSD completion credits in CIS.

Furthermore, DEL-JEN did not ensure compliance with the GAO internal control standards for ensuring adequate access restrictions to CIS. As of June 12, 2009, 197 Gainesville staff members had access to enter academic completion credits in CIS. This occurred due to a lack of SOPs providing for access restrictions to enter academic completion credits in CIS, and may lead to an increased risk of errors, fraud, misuse, or unauthorized alteration of academic completion credits. In response to our finding, DEL-JEN restricted access to enter academic completion credits to the records supervisor and records specialist.

In response to our draft report, Job Corps concurred with our audit results for CTT completions, student OBS and accountability, and academic completions (including

requisitions for expendable supplies and material orders are initiated by the center finance department.

Additionally, DEL-JEN did not ensure appropriate access to automated payroll information as required by the GAO internal control standards. The DEL-JEN corporate payroll clerk and tax accountant both had the ability to enter and change their personal payroll information in the Job Cost Accounting Management Information System. The potential for inappropriate access increased the risk of errors, fraud, misuse, or unauthorized alteration of staff payroll information. This occurred due to a lack of SOPs and system controls to limit the ability of payroll department staff to alter their own payroll information. During our audit, DEL-JEN contacted its software vendor and requested a security update in their next release, which would prevent any employee from accessing and altering their own payroll information. In the meantime, DEL-JEN will periodically monitor any changes made to employees' pay information using an audit report program, which identifies the initiator of any payroll changes.

In response to our draft report, both Job Corps and DEL-JEN concurred with our audit results for the hotline compliant allegations, including the segregation of duties and documentation issues we identified. The National Office of Job Corps concurred with our reported findings and recommendations. The Atlanta and Dallas Regional Job Corps Offices will coordinate with the DEL-JEN Corporate Office to improve corporate-level controls and monitoring over the Gainesville and Albuquerque Job Corps Centers. DEL-JEN concurred with our findings and has segregated the duties of the buyer and revised access to its payroll system.

**Objective 4 – Did the hotline complaints alleging improper management practices pertaining to staff hiring and firing decisions, student recreation funds, student government funds, student background checks and felon admissions, student medication used by staff, and center dental services provided to staff have merit?**

**Finding 4 –   Two of seven hotline complaint allegations had some merit.**

The allegations that an Albuquerque manager inappropriately ordered student medications for personal use, and an Albuquerque staff member inappropriately received dental services had some merit. We did not substantiate the remaining five allegations.

<u>Albuquerque Manager Ordered Student Medications for Personal Use</u>

The allegation that an Albuquerque manager used Job Corps funds to purchase at least two prescription medications, including one controlled substance, for personal use had some merit. DEL-JEN provided us with documentation that it discovered the manager used medication intended for students in January 2008 and required the manager to resign and self-report to the State of New Mexico Board of Nursing, which she did. However, controls at the center need strengthening to ensure medications are properly

- Gainesville management intentionally under-ran student recreational services in order to cover discretionary administrative over-runs, and this contributed to a riot at the center.

- Gainesville management used student government association funds to inappropriately purchase center equipment.

- Gainesville stopped doing background checks during PY 2007 and accepted students with felony records.

- A Gainesville manager circumvented DEL-JEN's human resources process and hired an unqualified former colleague.

- A Gainesville manager engaged in racially discriminatory hiring and firing practices.

During the audit, we found no evidence that Gainesville or DEL-JEN engaged in these five improper practices, as alleged. Our methodology for validating the merit of the complaint allegations is summarized in Appendix B.

DEL-JEN acknowledged that two of the seven hotline complaint allegations had some merit and stated that corrective action has already been initiated by the Albuquerque Job Corps Center to prevent the improprieties from reoccurring.

## RECOMMENDATIONS

We recommend that the National Director, Office of Job Corps, require DEL-JEN to:

1. Introduce and improve controls (such as SOPs) and monitoring over all centers to identify and correct any non-compliance with Job Corps safety and health program requirements and periodically test those controls to determine effectiveness. The controls and monitoring should ensure safety and health inspections are thorough and result in timely identification and correction of unsafe and unhealthy conditions.

2. Improve the effectiveness of supervisory oversight to staff responsible for complying with Job Corps performance reporting requirements.

3. Improve the effectiveness of data integrity audits conducted at each DEL-JEN center to identify any systemic non-compliance with Job Corps performance reporting requirements. These audits should continue to assess PRH compliance with all elements of performance reporting including student achievement, student OBS, and student attendance.

**PAGE INTENTIONALLY LEFT BLANK**

**PAGE INTENTIONALLY LEFT BLANK**

**PAGE INTENTIONALLY LEFT BLANK**

understanding of DEL-JEN's processes, policies, and procedures for managing center safety and reporting financial and performance information to Job Corps. We interviewed DEL-JEN's corporate officials at DEL-JEN's administrative office in Gardena, California, and conducted interviews with various DEL-JEN corporate management officials at several different field sites.

At the administrative office, we performed walkthroughs of DEL-JEN's corporate processes and identified and evaluated DEL-JEN's internal controls over center safety, performance, and financial reporting. We assessed risks related to financial and performance misstatement and evaluated DEL-JEN's overall control environment.

We selected one DEL-JEN center location -- Gainesville -- for detailed testing of center safety, financial activity, and performance data. We selected Gainesville based on a risk assessment, which considered a number of variables, including size of operations, the results of a prior Job Corps regional office assessment, hotline complaints, and OIG and Job Corps management concerns. We selected Albuquerque based on a hotline complaint we received in August 2007. We assessed the reliability of related data for the applicable audit period and determined that the data were sufficiently reliable to accomplish our audit objectives. We used a combination of statistical and judgmental sampling to select the items tested at these centers. Judgmentally selected items, which cannot be projected to the intended population(s) were chosen based on a number of factors including known deficiencies (i.e., related audit concerns identified in prior OIG, DOL, and DEL-JEN reports), inquiries of and information provided by Job Corps, DEL-JEN, and center personnel; and the nature of certain transactions (e.g., high dollar value, and susceptibility to theft or manipulation). Our methodology is described as follows:

## Gainesville

### Center Safety and Health

To gain a better understanding of the center's safety and health program, we interviewed key DEL-JEN and center officials and staff, reviewed applicable policies and procedures, performed walkthroughs, and conducted a physical review of the center's facilities. We also evaluated the results of corporate and DOL regional office assessments of center safety and health processes, safety and health committee meeting minutes, inspection reports, and center buildings to determine whether Gainesville effectively identified and corrected safety and health deficiencies. We also performed physical inspections to ensure that there were no apparent facility safety and health issues and to ensure that problems identified by center, corporate, and DOL reviews were corrected.

We reviewed 100 percent of the population of 84 students who incurred level I infractions resulting in disciplinary separations during PY 2007 to identify students who were involved in significant incidents reportable to Job Corps. We then compared the names and descriptions associated with these students and incidents to the student

reviewing student records to determine whether counselor case note documentation was present for each incident an AWOL was reported on the Employment and Training Administration (ETA) form 640. We further reviewed this population to determine whether the center adhered to PRH requirements for placing students on PDOF status. We did this by reviewing student records for students who were on 10 training days of PDOF either immediately or one day immediately prior to separation to determine whether there was evidence of pre-arranged and verifiable job interviews, appointments to visit or contact the Career Transition Services specialist, and approval of PDOF leave. Finally, we reviewed leave, AWOL, and sign-in documentation to ensure that a selected morning report was fully supported.

To determine whether controls over students on WBL were in place, we reviewed a judgmental selection of students who separated from Gainesville during PY 2007 and who were placed on off-center WBL. We reviewed a judgmental selection of 11 students by selecting one student from each month[5] during PY 2007 who worked for a different WBL employer and during a selected work week to determine whether there was evidence of signed time cards, performance evaluations, and signed WBL agreements with student-specific provisions.

To determine whether students reported as GED/HSD completers were accurately reported, we reviewed a statistical sample of student records (69 out of a population of 174) that Gainesville claimed as earning GED certificates and High School Diplomas during PY 2007. To verify GED/HSD attainment, we reviewed each student file for copies of certificates/diplomas and score reports/transcripts.

### Financial Reporting

We interviewed key DEL-JEN and center officials and staff, reviewed applicable policies and procedures, analyzed prior audit and Job Corps monitoring reports, and performed a walkthrough with selected transactions to gain a better understanding of the center's system for financial reporting.

For non-personnel expenses, we reviewed a judgmental sample of 18 from a population of 268 transactions chosen from the Gainesville Job Corps Center's detail job cost report. The sample was selected based on the following criteria: payments made in operating cost line items where overruns were identified, payments that appeared to be paid to unusual vendors, payments for items that appeared to be personal items, payments that appeared to be for unallowable expenses, and payments that appeared to be unusual in nature. This review of transactions was to determine if the expenses reported were reasonable, allocable, supported, and had proper approval documentation, and included tracing the expenses to the detail job cost report.

For personnel expenses, we performed a review of payroll expenditures and judgmentally selected and reviewed 13 employees from a population of 26 employees on payroll at Gainesville during PY 2007. This sample was selected based on

---

[5] One month of off-center WBL information was missing.

student satisfaction surveys. In addition, we obtained a copy of all ETA 2110 reports covering the period June 2008 through March 2009, as well as detailed job cost reports detailing ETA 2110 operating expense transactions charged over the same time period. We compared reported expenses to expenses charged for accuracy. We analyzed the Form 2110 over-run explanations for reasonableness and tested a judgmental sample of at least 5 selected transactions from each of the 7 expense categories that were associated with over-runs. These categories are (1) other support services, (2) other medical expense, (3) communications, (4) utilities and fuel, (5) motor vehicle expense, (6) administrative personnel expense, and (7) facilities maintenance personnel expense. This review of transactions was to determine if the expenses reported were reasonable, allocable, supported, and had proper approval documentation.

To determine whether the complainant's allegation that student government association funds were misused to purchase center equipment, we interviewed the deputy center director, accountant, and student government association leaders. We also reviewed copies of student government association checks, including voided checks for purchases not ultimately made.

To determine whether the complainant's allegation that Gainesville stopped doing background checks two years prior to May 2009 and accepted students with felony records, we reviewed a statistical sample of 45 student records selected from a population of 578 students enrolled at Gainesville during PY 2007. In our review, we determined whether there was documentation to support background checks and felony records.

To determine whether the complainant's allegation that a center manager engaged in racially discriminatory hiring and firing practices, we interviewed DEL-JEN's vice president for human resources, and reviewed the disposition of two Equal Employment Opportunity Commission complaints filed during November 2008 through February 2009 against the center manager by current and former Gainesville staff for race and color discrimination and retaliation.

## Criteria

We used the following criteria to perform this audit:

- Code of Federal Regulations.
- Federal Acquisition Regulations.
- Job Corps Policy and Requirements Handbook.
- DEL-JEN SOPs.
- GAO Standards for Internal Control in the Federal Government.

**PAGE INTENTIONALLY LEFT BLANK**

### Objective 1 – Did DEL-JEN ensure compliance with Job Corps requirements for managing center safety programs?

Finding 1 – For all three areas reviewed, DEL-JEN did not always ensure compliance with Job Corps requirements for managing center safety and health programs.

Del-Jen, Inc. (DJI) concurs that we can improve our oversight to ensure better compliance with all Job Corps and corporate requirements for managing Center safety and health programs. Safety and health are two key components of a successful Job Corps Center's operations. As such, DJI realizes that we must provide our staff with the necessary training, guidance and oversight to ensure strict compliance. While safety and health programs were in place, we did not always provide consistent local on-site monitoring and follow-up to ensure that appropriate follow up was taking place. Also, we recognize a need to provide better corporate oversight and assistance to our local management. Unsafe and unsanitary conditions must be quickly identified and corrected to ensure that our students and staff are protected.

### Objective 2 – Did DEL-JEN ensure compliance with Job Corps requirements for reporting performance?

Finding 2 – For all four areas reviewed, DEL-JEN did not always ensure compliance with Job Corps requirements for reporting performance.

Del-Jen agrees that we can strengthen our oversight of Job Corps performance reporting. Proper maintenance of student records is critical. While all of our records were available for review they were not always available in the student's official file maintained in the Students Record area. An SOP has been developed to ensure proper records maintenance.

Del-Jen still believes that we have provided the OIG adequate documentation (TARs) to validate Career Technical completion as mandated by the PRH. Of the 19 TARs in question we believe that all but 5 of them meet DOLs established guidelines for vocational completion. We still believe that our original documentation clearly shows the validity of the trade completion. DJI staff is available to discuss our rationale with Job Corps officials, if necessary. DJI concurs that four of the Tars are invalid, and 1 TAR was missing from the students file.

**Objective 3 – Did DEL-JEN ensure compliance with Job Corps requirements for managing and reporting financial activity?**

Finding 3 – For all three areas reviewed, DEL-JEN generally ensured compliance with Job Corps requirements for managing and reporting financial activity. However, controls over segregation of duties in the procurement of supplies and materials and payroll system access can be improved.

Del-Jen concurs with the OIG's findings and we have segregated the duties of the buyer and revised the system access to our payroll system.

**Objective 4 – Did the hotline complaints alleging improper management practices pertaining to staff hiring and firing decisions, student recreation funds, student government funds, student background checks and felon admissions, student medication used by staff, and center dental services provided to staff have merit?**

Finding 4 – Two of seven hotline complaint allegations had some merit.

While we acknowledge that two of the seven hotline complaint allegations had some merit we would like to reiterate that corrective action had already been initiated by the Center to ensure that the situations which occurred can not be repeated.

**Auditee Response:**

Del-Jen believes that the OIG auditors conducted very thorough audits and their recommendations to the National Office are reasonable. Del-Jen management will work with the National and Regional Office to determine the extent of any liquidated damages.

PAGE INTENTIONALLY LEFT BLANK

**TO REPORT FRAUD, WASTE, OR ABUSE, PLEASE CONTACT:**

Online: http://www.oig.dol.gov/        hotlineform.htm
Email: hotline@        oig.dol.gov

Telephone:    1-800-347-3756
              202-693-6999

Fax:          202-693-7020

Address:      Office of Inspector General
              U.S. Department of Labor
              200 Constitution Avenue, N.W.
Room          S-5506
              Washington, D.C. 20210

Exhibit 3

OCT-06-2010 WED 06:58 PM   HOMEWOOD ALLEN          FAX No. 2143836633                    P. 002

S10F6TX017

## SUBCONTRACT AGREEMENT

This Subcontract Agreement dated this 1st day of October, 2010, by and between Career Opportunities, Inc (COI) and Del-Jen, Inc. (DJI).

**GENERAL STATEMENT**

COI and DJI have prepared and submitted a proposal to the Department of Labor (DOL) for the operation of the North Texas Job Corps Center in McKinney, Texas, pursuant to the DOL's solicitation S10F6TX017. This Contract has been awarded to COI, and both COI and DJI recognize that the combination of their joint experience and skills contributed to the award of the Contract and will be essential in the successful performance of the Contract. Accordingly, in consideration of the premises, and the rights and obligations expressed in this Subcontract Agreement, the parties agree as follows:

**ARTICLE 1  AGREEMENT**

This Agreement is entered into between COI and DJI for the purpose of defining the relationship between COI and DJI and their respective rights and responsibilities in providing education, vocational training, social skills and employability training, and related support services for a total of 650 residential students in accordance with the Statement of Work, Schedule A.

**ARTICLE 2  ENTITIES**

COI is the prime contractor to DOL, and DJI is the designated subcontractor for a portion of the operation of the Center.

Pursuant to its Contract with the DOL, COI has elected to subcontract the Social Development Personnel and materials, Security Personnel and materials, Support Services Personnel and materials, Clothing, Communications, and Utilities to DJI in accordance with its proposal with the DOL and the proposal submitted by DJI for this Contract.

**ARTICLE 3  DEFINITIONS**

"Contractor" as used in this Agreement shall mean COI.

"Subcontractor" as used in this Agreement shall mean DJI.

"Center Director" as used in this Agreement shall mean the individual duly appointed by COI with responsibility and authority for planning, budgeting, contracting, directing, and operating the entire program at the Center.

Page 1 of 10

OCT./06/2010 WED 06:58 PM   HOMEWOOD ALLEN      FAX No. 2143636693         P. 003

"PRH" as used in this Agreement shall mean the Job Corps Policy and Requirement Handbook.

"Students" as used in this Agreement shall mean those individuals who are duly enrolled in the center program and entitled to services as hereinafter defined.

## ARTICLE 4   PERIOD OF PERFORMANCE

The parties mutually agree that, subject to DOL approval, this Agreement will be in effect from November 1, 2010 through October 31, 2015 inclusive, which includes three one-year (1-year) options. The Period of Performance is contingent upon the Contract being funded by the DOL for the three 1-year options and the performance of the subcontractor.

## ARTICLE 5   TERMINATION

In the event of a material default in the performance of either party, or upon a finding of non-performance of Subcontractor by the Contractor or DOL, the other party may terminate this Agreement upon condition of the following: (1) providing written notice of the default to the party in default, stating with specificity the nature of the default and (2) providing 20 business days for the party in default to cure such default. If the party in default cures such default after notice and during the cure period, no termination shall be allowed.

In the event the DOL terminates the Contract for any reason except the default of the Contractor without cause or contribution to such Contractor's default by the Subcontractor, the effective date of that termination will also apply to the Subcontractor, and this Agreement, unless terminated sooner as provided for above.

## ARTICLE 6   INDEMNIFICATION

To the fullest extent permitted by law, the Contractor and Subcontractor shall indemnify, defend and hold harmless one another, their consultants, and agents and employees from and against all claims, liabilities, damages, suits, losses, penalties, fines, fees, costs and expenses of any nature whatever, including but not limited to attorney's fees, arising out of or resulting from performance of the Work, or arising in whole by negligent acts or omissions of Contractor or Subcontractor, a subcontractor of Contractor or Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this paragraph.

The indemnification provided to the Contractor and Subcontractor under this paragraph shall not be limited by the fact that statutory or other limitations may apply to damages, compensation or benefits payable by or for the Contractor and Subcontractor.

Page 2 of 10

## ARTICLE 7  GENERAL PROVISIONS

A.    The Subcontractor agrees and acknowledges that DOL reserves the right to change, modify, alter, and revoke certain PRH standards.

B.    Subcontractor shall adhere to the policies, procedures, guidelines, and technical supplements, information notices, instruction notices, technical assistance guides, and the Job Corps Policy and Requirements Handbook (PRH) established and disseminated by the Office of Job Corps.

C.    Subcontractor shall make no public statements with respect to Job Corps, this Agreement or its work thereunder, and shall issue no news release, advertising, or conduct research related thereto without the prior written approval of the Center Director or an authorized representative of COL.

D.    Under this Agreement, the Subcontractor shall be an independent Subcontractor and not an employee or agent of the Contractor or DOL, Job Corps.

## ARTICLE 8  STATEMENT OF WORK

Subcontractor agrees to provide services in accordance with such standards established by the Office of the Director, Job Corps, DOL and the Contractor. Subcontractor shall establish standards and SOP's, in accordance with DOL mandates and best practices. Subcontractor also agrees to provide the following services:

See attached Schedule A, Statement of Work.

## ARTICLE 9  STAFFING

Subcontractor agrees to provide the following staffing in order to fulfill its contract:

95.0 FTE's

Subcontractor agrees to:

-Recruit and hire only qualified staff.

-Ensure that proper staff coverage will be maintained in the event of Subcontractor staff illnesses and vacation.

-Employ FTEs or full-time equivalent staff proposed during the period of the contract. Subcontractor also agrees to request approval from the contractor to reduce or increase the number of staff equivalents.

Page 3 of 10

-Not employ a staff member who has a relative employed at the North Texas Job Corps Center by either the Contractor or Subcontractor as part of center staff without prior written approval of the contracting officer (PRH).

-Support programmatic initiatives promulgated by either, the National Office of Job Corps, the Regional Office of Job Corps or COI.

-Not solicit or hire any employee of Contractor during the term of his or her employment with Contractor and for three months after the term of employment ends.

Contractor agrees not to solicit or hire any employee of Subcontractor during the term of his or her employment with Subcontractor and for three months after the term of employment ends. Either the Contractor or Subcontractor may waive this criteria, in writing, at any time.

## ARTICLE 10  SUPERVISION/COORDINATION

Subcontractor shall be responsible for the direct supervision of all their employees. The Subcontractor's Director, Social Development will report to the COI Center Director (Please see Schedule E - Organizational Chart.) This individual will also attend meetings that are scheduled by the Center Director when requested to attend.

The Subcontractor will channel all formal communications, email, memos, etc., to the Regional Office, through the Contractor in order to maintain clear lines of communication.

## ARTICLE 11  HOLIDAYS

The Subcontractor shall adhere to the holiday schedule published by the Contractor. The number of holidays will not exceed ten (10) annually unless prior written approval is obtained from the Contractor.

## ARTICLE 12  STAFF TRAINING

The Subcontractor agrees that all of its employees working at the North Texas Job Corps Center will attend all staff training scheduled by the Center and, as required by the PRH and the Director of Job Corps (e.g., CPR, first aid, sexual harassment, alcohol/drug abuse,OSHA, etc.).

## ARTICLE 13  EQUIPMENT

All equipment provided to the Subcontractor under this subcontract is owned by the DOL and is in the custody of the Contractor. The Subcontractor will be required to assume responsibility for the care and security of the equipment issued to the Subcontractor under this agreement. The Subcontractor will sign for the receipt of all

Page 4 of 10

equipment issued to operate the subcontracted programs. Upon the Subcontractor's discovery and knowledge that equipment is lost, damaged, or destroyed, the Subcontractor will report such loss, damage or destruction to the Center Director within 24 hours of said discovery and knowledge.

## ARTICLE 14   STUDENT SUPPLIES AND MATERIALS

The Subcontractor will provide all the budgeted student supplies and materials needed to deliver the services under this agreement. The Subcontractor must utilize the Contractor's purchase requisition system to obtain the supplies and materials. When requested, the Subcontractor will forecast its student supplies and material needs.

## ARTICLE 15   LIMITS OF LIABILITY

The Subcontractor shall not be responsible for failure to perform this Agreement due to any cause beyond the Subcontractor's control or for any consequential or special damages. The Subcontractor, under this Agreement, shall be required to provide a minimum of the following insurance coverage, evidence of which will be furnished to the Contractor upon execution of this Agreement:

A. Worker's Compensation Insurance covering all employees engaged in furnishing services under this Agreement, including employer's liability coverage in the State of Texas, per statutory limits.

B. Subcontractor's Liability Coverage for bodily injury, property damage, and personal injury in the amount of $1,000,000 per occurrence, $2,000,000 aggregate.

C. Automobile liability. The subcontractor is required to have automobile liability insurance written on the comprehensive form of their insurance policy. The policy shall provide coverage for bodily injury and property damage liability covering the operation of all automobiles used in connection with performing the contract, of at least $200,000 per person and $500,000 per occurrence for bodily injury and $20,000 per occurrence of property damage.

Subcontractor will notify the Contractor immediately upon notice that their insurance has been terminated or canceled.

## • ARTICLE 16   CONFIDENTIALITY/TRADE SECRETS

Contractor and Subcontractor acknowledge they may obtain each other's private, confidential, and copyrighted financial and business information in the form of paper as well as electronic records. During the term of this Agreement, Contractor and Subcontractor have, and will have access to and become acquainted with various trade secrets consisting of such things as, but not limited to, customer lists, business plans, methods, procedures and processes of operations as well as financial data which is not

Page 5 of 10

subject to public disclosure and compilations of information, records and specifications, all of which are owned by either Contractor or Subcontractor and regularly used in the operation of their respective businesses. Contractor and Subcontractor agree that any unauthorized use, misuse, misappropriation or disclosure of any of the above-referenced trade secrets, directly or indirectly, by the other party during or after the term of this Agreement shall constitute unfair competition. Contractor and Subcontractor therefore agree not to disclose any such information to anyone. Contractor and Subcontractor agree to pay for any loss or damage to the other party resulting from a breach of this Article, including reasonable attorneys' fees. Contractor and Subcontractor further agree to indemnify each other from and against any and all damages, costs and expenses, including reasonable attorneys fees, incurred in connection with claims of third parties arising from breach of this Article.

### ARTICLE 17   FINANCIAL INSOLVENCY DEFAULT

Either party reserves the right to terminate this Agreement if at any time during the term of this Agreement the other party files or has filed against it in any court, pursuant to any statute, either of the United States, or of any state, territory, or possession, a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver to receive all or a portion of the other party's property, or if the other party makes an assignment for the benefit of creditors, other than to guarantee a line of credit.

### ARTICLE 18   ENTIRE AGREEMENT

This Agreement supersedes all previous Agreements, oral or written, between the Subcontractor and Contractor. No other Agreements or representation, oral or written, have been made by the Contractor. This Agreement may not be altered, modified, or amended, except in writing properly executed by an authorized representative of the Subcontractor, Contractor, and, if required, the DOL.

### ARTICLE 19   COSTS, OVERHEAD, FEE

A List of Costs / Overhead and Fee amounts is attached and marked Schedule B. See Schedule B1 for details.

The costs include administrative overhead, which include but are not limited to the G&A services set forth in Schedule C, according to the same provisions applicable to the prime contractor and specified in the prime contract.

Under no circumstances will the Subcontractor bill the Contractor in excess of the agreed costs, administrative overhead and fee expenses, without prior written notification to the Contractor.

Annual Budget
Based on good faith and current funding information, annual operating budgets for the period of November 1, 2010 to October 31, 2015 are shown in Attachment

Page 6 of 10

A to this Agreement. It is understood by the Contractor and Subcontractor that these estimated budgets may be modified throughout the period of this Agreement by agreement of both parties or at the direction of DOL.

**Invoices**

Invoices will be prepared and submitted by Subcontractor and payments made by Contractor on a ~~semi~~-monthly basis.

**Payments**     *Bi - monthly*

1.  Payments will be made to Subcontractor only. Subcontractor shall not assign rights to payment under this agreement to a bank, creditor, or other third party without prior written approval of Contractor.

2.  Payment terms from Contractor to Subcontractor shall be net 10 days from the date that Contractor receives payment from the Government.

3.  Payments will be made by wire transfer to a bank designated by the Subcontractor:

## ARTICLE 20  AUDIT

The Subcontractor is subject to audit by the DOL and/or the Contractor at any time. All reports, books, ledgers, receipts, bills, etc., that are used in the delivery of services specified in this Agreement must be presented for audit upon the request of the Contractor.

## ARTICLE 21  DOL ASSESSMENTS

The Subcontractor is subject to an annual Department of Labor assessment conducted by the Department of Labor, and Corporate reviews by the Contractor. Any findings and/or observations will require responses to the Department of Labor and/or Contractor within 30 days from the receipt of the findings and observations.

The Subcontractor is also subject to on-site visits by DOL representatives and/or representatives of the Contractor.

## ARTICLE 22  CONTRACT CLAUSES

The Agreement incorporates the FAR contract clauses relating to a cost reimbursement contract in force and effect as if they were given in full text. See Addendum I for a list of referenced clauses (Original Contract). Where applicable, insert the term "Subcontractor" in place of "Contractor". Upon request, the Contractor will make the appropriate text available, which applies to the subcontract.

## ARTICLE 23  ASSIGNMENT

This Agreement inures to the benefit of the parties' successors and assigns. The Agreement is not assignable by Subcontractor without prior written consent of the Contractor which shall not be unreasonably withheld.

Page 7 of 10

### ARTICLE 24  EMPLOYEE RESPONSIBILITY

During the period the students are under the supervision of the Subcontractor's employees, the employees will be responsible for enforcing:

- A. All safety rules and regulations of the Contractor, the DOL Office of Job Corps and OSHA;
- B. Center disciplinary procedures;
- C. Center student accountability procedures; and
- D. Center rules and regulations.

Center disciplinary procedures will be established by the Center Director, and a common "Minimum Standards" will be used center-wide by both the Contractor staff and Subcontractor staff as a basis for dealing with student discipline.

### ARTICLE 25  STUDENT PERFORMANCE EVALUATIONS

The Subcontractor's employees may be assigned to participate in evaluation of student progress. It is expected that Subcontractor staff will work with the Contractor's staff to develop scheduling for evaluation of student progress at such times that will result in minimal disruption to the program. Evaluation of student progress will be scheduled within normal working hours.

### ARTICLE 26  FACILITY REQUIREMENTS

The Contractor shall provide the Subcontractor with administrative and programmatic space on center to operate its programs. The Contractor shall also provide supporting utilities and equipment.

### ARTICLE 27  SUBCONTRACTOR RESPONSIBILITIES

The Subcontractor will be responsible to perform the services identified in the Statement of Work - Schedule A.

### ARTICLE 28  ADMINISTRATIVE SUPPORT

NOTE: The Contractor shall provide the Subcontractor with the following items at no cost to the Subcontractor, except as noted:

1. Acquisition, cleaning, repair, and maintenance of furniture and equipment.
2. Telephone service and fax service.
3. Mail (postage).
4. Trash and garbage collection.
5. Utilities services (paid by subcontractor)
6. Filing cabinets.
7. Computers and printers.
8. Reproduction, including costs of materials.

Page 8 of 10

9.   Student transportation (except for drivers).
10.  Newspaper advertisement for employee recruitment.
11.  Drug testing for new employees.
12.  Direct reimbursement to staff for any required travel, per diem, or incidental expenses.
13.  Entry into DJI payroll and Human Resources systems.
14.  HR support, as needed.

The Subcontractor may elect to utilize any, all or none of the above listed services.

### ARTICLE 29  DISPUTE RESOLUTION—BINDING ARBITRATION

The parties agree to cooperate with each other in good faith to resolve any dispute, claim or cause of action arising out of this Agreement or relating to a party's performance of this Agreement (Dispute) before resorting to the arbitration provisions below.

In the event of any Dispute, the party claiming the Dispute must first provide written notice to the other party immediately upon the party's knowledge of the events which comprise the Dispute. Unless such notice is provided within two weeks after the claiming party first becomes aware of the events which comprise the Dispute, the Dispute will be deemed waived. Statutes of limitations that would otherwise apply shall be applicable in the mediation or arbitration proceedings.

The parties shall submit all unresolved Disputes to mediation prior to either party initiating a demand for arbitration pursuant to this section, unless delay in initiating or prosecuting a proceeding in arbitration would prejudice either of the parties. The parties will agree in writing as to the identity of the mediator and the rules and procedures of mediation. If the parties cannot agree, then the Dispute will be submitted to mediation under the then current Commercial Mediation Rules of the American Arbitration Association.

All Disputes that the parties are unable to resolve cooperatively or by mediation will be decided by BINDING ARBITRATION. The agreement to arbitrate will be specifically enforceable under the prevailing laws of the State of Texas, with the arbitration locale in the place in which the Contract is performed. The parties will agree in writing as to the identity of the arbitrator and the rules and procedures of the arbitration. If the parties do not so agree, then they will submit the Dispute to arbitration under the then current Commercial Arbitration Rules of the American Arbitration Association.

The arbitrator's award will be final, judgment may be entered upon it in any court having jurisdiction, and the award will not be subject to modification or appeal. In any judicial proceedings to enforce this agreement to arbitrate, the only issues to be determined will be those set forth in the Federal Arbitration Act, and these issues will be determined by a court without a jury. All other issues, such as arbitrability, prerequisites to arbitration, and issues arising out of this Agreement, including limitations of damages

Page 9 of 10

and statutes of limitations, will be for the arbitrator to decide, whose decision will be final and binding. There will be no interlocutory appeal of an order compelling arbitration.

**ARTICLE 30 NOTICE**

Any notice required or provided for by this Agreement or pursuant to the performance of the Contract shall be deemed effective if made in writing and delivered either by person with affidavit of delivery, overnight delivery (UPS, Fed Ex etc.) with return receipt, or by registered U.S. Mail with return receipt to the following:

| | |
|---|---|
| If to COI: | If to DJI: |
| Pam Hess, President | David Stout, President E&T Group |
| 1251 IH 35N | Del-Jen, Inc |
| PO Box 1746 | 14224 N. 3rd Ave |
| San Marcos, TX 78667-1746 | Phoenix, AZ 85023 |

& Karric Brockman

The names and addresses above may be changed upon written notice to the other party.

Each of the parties hereto has caused this Agreement to be duly executed in its behalf by its duly authorized officer to be effective on November 1, 2010.

Career Opportunities, Inc.
Pam Hess- President

By ~~_____~~

Date: 10/1/10

Del-Jen, Inc.
David L. Stout-President E&T

By: ~~_____~~

Date: 10/1/10

The following Documents incorporated herein:

Schedule A, Statement of Work
Schedule B, List of Costs, Overhead, Fee
Schedule B1, DJI Program Budget
Schedule C, General and Administrative Services
Schedule D, Incorporated FAR Clauses (Original Contract)
Schedule E, Organization Chart

Page 10 of 10

OCT./06/2010 WED 07:00 PM   HOMEWOOD ALLEN        FAX No. 2143836693              P. 012



Operation of the North Texas Job Corps Center
With OA/CTS – RFP No. 810F8TX017 – May 18, 2010
Final Proposal Revision – Subcontracting



## SUBCONTRACTING PLAN

Career Opportunities will subcontract several major components of the North Texas Job
Corps Center with OA & CTS Contract. Each Subcontract is described below as required by
the RFP.

### Del-Jen Corporation (DJI)
### 1216 Lafayette Road
### Clarksville, TN 37042

Del-Jen, Inc. (DJI) will be the largest subcontractor and has submitted a cost proposal which
is included in the original submission of the BMP. DJI has guaranteed they will be available
to start October 1, 2010. This subcontract will be responsible for 31.26% of total dollars or
$11,673,468. DJI has extensive experience in operating Job Corps Centers. They currently
operate four Centers including Albuquerque, Mississippi, Kittrell, and Gainsville.
Their responsibilities at the North Texas Center will include the following:

- Residential Living and related expenses.
- Support Services, the Drivers
- Support Services, dormitory supplies
- Security and related expenses
- Required insurance

The following positions will report to DJI:

**Social Development: (55.0)**
Social Development Director (1.0)
Secretary (1.0)
Student Leadership Coordinator (1.0)
PNC Coordinator (1.0)
Extended Training Day Specialist (1.0)
Residential Living Manager (1.0)
Lead ILA (9.0)
Day ILA (2.0)
ILA (35.0)
Substitute ILA (3.0)

**Recreation/Avocation: (10.0)**
Recreation/Avocation Manager (1.0) *r. t*
Recreation Specialist (8.0)
Student Recreation Aide (1.0)

**Safety/Security/Transportation: (27.0)**
SST Manager (1.0)
Safety Compliance Officer (1.0)

FLUOR CORPORATION'S MOTION FOR SUMMARY JUDGMENT - PAGE 21

OCT/06/2010 WED 07:01 PM   HOMEWOOD ALLEN        FAX No. 2143856693               P. 013



Operation of the North Texas Job Corps Center
With OAKTS – RFP No. 810F6TX017 – May 18, 2010
Final Proposal Revision – Subcontracting



Lead Security Officer (3.0)
Security Officer (12.0)
Lead Driver (1.0)
Driver (9.0)

**Student Code of Conduct:  (3.0)**
CSIO (1.0
CSIO Assistant (1.0)
CSIO Clerk (1.0)

In addition to what was submitted in the original BMP, DJI will also be responsible for:

- Clothing
- Communications
- Utilities and Fuel

The cost for these three additional responsibilities are included in the 31.26% or $11,673,468 as stated above.

Use or disclosure of data is subject to the restriction on the title page of this proposal.
RFP No. 810F6TX017 – North Texas FPR – Subcontracting – May 18, 2010

2

FLUOR CORPORATION'S MOTION FOR SUMMARY JUDGMENT – PAGE 23

| Del-Jen Subcontract | | | | | | Schedule B1 |
|---|---|---|---|---|---|---|
| | | | SECOND | | | |
| 01  ACADEMIC  PERSONNEL EXP | - | - | - | - | - | - |
| 02  OTHER ACADEMIC EXP | - | - | - | - | - | - |
| 03  CTT  PERSONNEL EXP | - | - | - | - | - | - |
| 04  OTHER CTT EXP | - | - | - | - | - | - |
| 05  CAREER SUCCESS PERSONNEL EXP | 4,002 | 2,601,591 | 4,058 | 2,638,013 | 4,030 | 5,239,604 |
| 06  OTHER CAREER SUCCESS EXP | 280 | 181,892 | 284 | 184,442 | 282 | 366,334 |
| 07  FOOD | - | - | - | - | - | - |
| 08  CLOTHING | 493 | 320,194 | 495 | 321,671 | 494 | 641,865 |
| 09  SUPPORT SERVICE  PERSONNEL EXP | 488 | 317,134 | 495 | 321,574 | 491 | 638,708 |
| 10  OTHER SUPPORT SERVICES EXP | 116 | 75,090 | 117 | 76,139 | 116 | 151,229 |
| 11  MEDICAL PERSONNEL EXP | - | - | - | - | - | - |
| 12  OTHER MEDICAL EXP | - | - | - | - | - | - |
| 13  CP/CTR PERSONNEL EXP | - | - | - | - | - | - |
| 14  OTHER CP/CTR EXP | - | - | - | - | - | - |
| 15  ADMIN PERSONNEL EXP | - | - | - | - | - | - |
| 16  OTHER ADMIN EXP | 4 | 2,500 | 4 | 2,535 | 4 | 5,035 |
| 17  INDIRECT ADMIN EXP | 519 | 337,651 | 526 | 342,182 | 523 | 679,833 |
| 18  FACIL MAINT PERSONNEL EXP | - | - | - | - | - | - |
| 19  OTHER FACIL MAINT EXP | - | - | - | - | - | - |
| 20  SECURITY PERSONNEL EXP | 1,039 | 675,109 | 1,053 | 684,561 | 1,046 | 1,359,670 |
| 21  OTHER SECURITY EXP | 32 | 21,000 | 33 | 21,286 | 33 | 42,286 |
| 22  COMMUNICATION | 188 | 121,960 | 190 | 123,667 | 189 | 245,627 |
| 23  UTILITIES AND FUEL | 1,333 | 866,160 | 1,351 | 878,287 | 1,342 | 1,744,447 |
| 24  FACILITY LEASE COST | - | - | - | - | - | - |
| 25  INSURANCE | 18 | 12,000 | 19 | 12,168 | 19 | 24,168 |
| 26  MOTOR VEHICLE OPERATING EXP | - | - | - | - | - | - |
| 27  TRAVEL and TRAINING | - | - | - | - | - | - |
| 28  CONTRACTORS FIXED/BASE FEE | 306 | 199,162 | 311 | 201,835 | 308 | 400,997 |
| 29  CONTRACTORS INCENTIVE/AWARD FEE | 102 | 66,387 | 104 | 67,278 | 103 | 133,665 |

NEEDS CORRECT FOR PAGE
FOR TOTAL LINE

**Del-Jen Subcontract**                                                                 **Schedule B1**

| FINAL BUDGET LINE ITEM | | | | | | | | |
|---|---|---|---|---|---|---|---|
| 01 ACADEMIC PERSONNEL EXP | - | - | - | - | - | - | - | - |
| 02 OTHER ACADEMIC EXP | - | - | - | - | - | - | - | - |
| 03 CTT PERSONNEL EXP | - | - | - | - | - | - | - | - |
| 04 OTHER CTT EXP | - | - | - | - | - | - | - | - |
| 05 CAREER SUCCESS PERSONNEL EXP | 4,115 | 2,674,945 | 4,173 | 2,712,394 | 4,231 | 2,750,368 | 4,116 | 13,377,311 |
| 06 OTHER CAREER SUCCESS EXP | 288 | 187,026 | 292 | 189,644 | 296 | 192,299 | 288 | 935,302 |
| 07 FOOD | - | - | - | - | - | - | - | - |
| 08 CLOTHING | 497 | 325,168 | 500 | 324,687 | 502 | 326,227 | 497 | 1,615,947 |
| 09 SUPPORT SERVICE PERSONNEL EXP | 502 | 326,078 | 508 | 330,641 | 516 | 335,270 | 502 | 1,630,695 |
| 10 OTHER SUPPORT SERVICES EXP | 119 | 77,205 | 120 | 78,286 | 122 | 79,382 | 119 | 386,102 |
| 11 MEDICAL PERSONNEL EXP | - | - | - | - | - | - | - | - |
| 12 OTHER MEDICAL EXP | - | - | - | - | - | - | - | - |
| 13 CP/CTR PERSONNEL EXP | - | - | - | - | - | - | - | - |
| 14 OTHER CP/CTR EXP | - | - | - | - | - | - | - | - |
| 15 ADMIN PERSONNEL EXP | - | - | - | - | - | - | - | - |
| 16 OTHER ADMIN EXP | 4 | 2,570 | 4 | 2,606 | 4 | 2,642 | 4 | 12,853 |
| 17 INDIRECT ADMIN EXP | 534 | 346,777 | 541 | 351,437 | 548 | 356,162 | 534 | 1,734,209 |
| 18 FACIL MAINT PERSONNEL EXP | - | - | - | - | - | - | - | - |
| 19 OTHER FACIL MAINT EXP | - | - | - | - | - | - | - | - |
| 20 SECURITY PERSONNEL EXP | 1,068 | 694,145 | 1,083 | 703,663 | 1,098 | 713,717 | 1,068 | 3,471,395 |
| 21 OTHER SECURITY EXP | 33 | 21,584 | 34 | 21,888 | 34 | 22,192 | 33 | 107,948 |
| 22 COMMUNICATION | 193 | 125,398 | 196 | 127,153 | 198 | 128,933 | 193 | 627,111 |
| 23 UTILITIES AND FUEL | 1,370 | 890,583 | 1,389 | 903,051 | 1,409 | 915,894 | 1,370 | 4,453,775 |
| 24 FACILITY LEASE COST | - | - | - | - | - | - | - | - |
| 25 INSURANCE | 19 | 12,338 | 19 | 12,511 | 20 | 12,686 | 19 | 61,703 |
| 26 MOTOR VEHICLE OPERATING EXP | - | - | - | - | - | - | - | - |
| 27 TRAVEL and TRAINING | - | - | - | - | - | - | - | - |
| 28 CONTRACTORS FIXED/BASE FEE | 315 | 204,545 | 319 | 207,294 | 323 | 210,081 | 315 | 1,022,917 |
| 29 CONTRACTORS INCENTIVE/AWARD FEE | 105 | 68,182 | 106 | 69,098 | 108 | 70,027 | 105 | 340,972 |
| 30 NET CENTER OPERATIONS EXP | 9,181 | 5,954,541 | 9,284 | 6,034,551 | 9,409 | 6,115,680 | 9,183 | 29,778,240 |

FLUOR CORPORATION'S MOTION FOR SUMMARY JUDGMENT - PAGE 24

OCT/06/2010/WED 07:01 PM   HOMEWOOD ALLEN       FAX No. 2143836693              P. 016

## Del-Jen Subcontract                              Schedule C

| Indirect Cost Rate | | | | | | |
|---|---|---|---|---|---|---|
| | | Rate for each Contract Year | | | | |
| **Indirect Cost** | **Base of Allocation** | **1** | **2** | **3** | **4** | **5** |
| G&A | Total Costs, excluding G&A and Contractor's Fee | 6.50% | 6.50% | 6.50% | 6.50% | 6.50% |
| Overhead Not Applicable | Total Direct Salaries and Wages (including/excluding fringe benefits | | | | | |
| | Total Indirect Cost | NA | NA | NA | NA | NA |
| | **Total Indirect Cost** | **6.50%** | **6.50%** | **6.50%** | **6.50%** | **6.60%** |

EXHIBIT 4

Case 3:16-cv-03248-S   Document 16   Filed 09/12/17   Page 82 of 103   PageID 555

## Center Report Card by Rank (OMS-10R)

### Report Period: 7/1/2012 - 6/30/2013

| Center ID | Center Name | Overall Rating | Overall Ranking | Direct Center Services | | | | | | Initial Career Transition Services | | | | | Long Term Career Transition Services | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | GED/HSD Ranking | CTT Completion Ranking | Crdntl Ranking | Combo Ranking | Literacy Ranking | Numeracy Ranking | OTMO PSC Ranking | Former Enrolee Plcmt Ranking | Graduate Plcmt Ranking | Graduate Average Wage Ranking | Grad F/T Plcmt Ranking | 6 Mo. Follow-Up Ranking | 6 Mo. Earn Ranking | 12 Mo. Follow-Up Ranking |
| 040300 | Finch-Henry Job Corps Center | 105.8% | 25 | 76 | 3 | 113 | 46 | 14 | 25 | 3 | 81 | 112 | 113 | 58 | 17 | 25 | 6 |
| 030400 | Flatwoods Job Corps Civilian Conservation Center | 105.6% | 26 | 57 | 91 | 23 | 94 | 22 | 6 | 11 | 77 | 55 | 2 | 10 | 81 | 2 | 68 |
| 080600 | Trapper Creek Job Corps Civilian Conservation Ctr | 105.6% | 20 | 99 | 114 | 12 | 104 | 5 | 5 | 4 | 40 | 6 | | 37 | 55 | 3 | 10 |
| 000100 | Hawaii Job Corps Center | 105.4% | 28 | 14 | 15 | 47 | 5 | 89 | 54 | 40 | 112 | 80 | 94 | 26 | 30 | 74 | 3 |
| 080300 | Clearfield Job Corps Center | 105.3% | 29 | 19 | 33 | 17 | 50 | 58 | 52 | 54 | 54 | 30 | 89 | 43 | 76 | 77 | 54 |
| 020100 | Arecibo Job Corps Center | 105.1% | 30 | 59 | 18 | 60 | 53 | 100 | 83 | 28 | 15 | 12 | 71 | 106 | 8 | 112 | 37 |
| 100900 | Tongue Point Job Corps Center | 105.1% | 30 | 52 | 46 | 52 | 74 | 33 | 35 | 29 | 46 | 49 | 6 | 17 | 97 | 4 | 20 |
| 030800 | Philadelphia Job Corps Center | 105.0% | 32 | 6 | 11 | 10 | 36 | 103 | 62 | 26 | 51 | 93 | 61 | 120 | 103 | 70 | 70 |
| 070500 | St. Louis Job Corps Center | 104.8% | 33 | 39 | 48 | 60 | 15 | 18 | 34 | 47 | 57 | 76 | 88 | 80 | 31 | 103 | 42 |
| 050900 | Hubert H. Humphrey Job Corps Center | 104.6% | 34 | 35 | 63 | 30 | 86 | 72 | 51 | 38 | 57 | 4 | 12 | 70 | 27 | 50 | 63 |
| 060800 | North Texas Job Corps Center | 104.6% | 34 | 49 | 41 | 76 | 20 | 98 | 79 | 9 | 10 | 24 | 63 | 89 | 75 | 90 | 13 |
| 100400 | Curlew Job Corps Civilian Conservation Center | 104.5% | 36 | 32 | 54 | 25 | 40 | 15 | 43 | 72 | 34 | 84 | 23 | 19 | 56 | 100 | 30 |
| 030700 | Old Dominion Job Corps Center | 104.3% | 37 | 5 | 68 | 36 | 39 | 47 | 48 | 69 | 57 | 66 | 47 | 97 | 77 | 19 | 101 |
| 070200 | Excelsior Springs Job Corps Center | 104.3% | 37 | 48 | 37 | 86 | 33 | 70 | 77 | 56 | 14 | 48 | 52 | 51 | 41 | 72 | 41 |
| 010800 | Exeter Job Corps Center | 104.2% | 39 | 40 | 12 | 50 | 17 | 65 | 90 | 33 | 84 | 70 | 81 | 105 | 35 | 18 | 17 |
| 031300 | Woodstock Job Corps Center | 104.0% | 40 | 57 | 104 | 76 | 65 | 55 | 41 | 35 | 13 | 6 | 32 | 27 | 32 | 89 | 9 |
| 080700 | Weber Basin Job Corps Civilian Conservation Center | 103.6% | 41 | 71 | 56 | 45 | 59 | 45 | 40 | 86 | 102 | 10 | 80 | 66 | 10 | 6 | 37 |
| 100200 | Cascades Job Corps Center | 103.5% | 42 | 27 | 81 | 30 | 107 | 49 | 23 | 60 | 20 | 97 | 22 | 24 | 50 | 40 | 42 |
| 030500 | Harpers Ferry Job Corps Civilian Conservation Ctr | 103.4% | 43 | 2 | 13 | 7 | 3 | 68 | 100 | 111 | 95 | 117 | 42 | 41 | 90 | 55 | 107 |
| 061100 | Roswell Job Corps Center | 103.2% | 44 | 21 | 22 | 67 | 10 | 109 | 114 | 72 | 69 | 45 | 38 | 36 | 50 | 27 | 53 |
| 042000 | Schenck Job Corps Civilian Conservation Center | 103.0% | 45 | 55 | 30 | 27 | 31 | 51 | 48 | 23 | 97 | 56 | 53 | 70 | 66 | 45 | 108 |
| 042400 | Gadsden Job Corps Center | 103.0% | 45 | 49 | 31 | 4 | 26 | 37 | 47 | 100 | 96 | 30 | 108 | 83 | 83 | 31 | 64 |
| 040100 | Atlanta Job Corps Center | 102.8% | 47 | 4 | 7 | 63 | 2 | 42 | 37 | 79 | 100 | 118 | 120 | 123 | 108 | 116 | 120 |
| 100600 | Centennial Job Corps Civilian Conservation Center | 102.7% | 48 | 102 | 102 | 91 | 117 | 37 | 9 | 33 | 6 | 43 | 17 | 12 | 19 | 38 | 7 |

# EXHIBIT 5



December 17, 2013

Frank Cornish
North Texas Job Corps Center
1701 N. Church Street
McKinney, TX 75069

Re:     Aklilu Tesfaye's Completion

Dear Mr. Cornish,

Aklilu Tesfaye successfully completed the New Learning Resources School District's requirements for a North New Summit High School Diploma on December 17, 2013. He is a graduate of North New Summit School.

Should you have any questions, please feel free to contact me.

Sincerely,

Randell S. Douglas
Distance Learning Coordinator

1435 B Lelia Drive * Jackson, MS 39216 *(601) 982-8003 * Fax (601) 982-0083

5/8/2014                          **Center Information System**                          Page 1 of 2
                                  **North Texas Job Corps Center**
                                  **ALL TABE READING DIAGNOSTICS**

| Stud id | Stud Name | Test Type | Test Form | Valid Test | Test Date | Overal Grade | Overal Score | Objective | Passing Requirements | Correct No | Passed |
|---------|-----------|-----------|-----------|------------|-----------|--------------|--------------|-----------|----------------------|------------|--------|
| 1385842 | Tesfaye, Aklilu D | TABE Reading | 10L | Y | 10/25/2012 | 2.1 | 381 | | | | |
| | | | | | | | | Pre-Read Matching Letters | 5 of 6 | 6 | Yes |
| | | | | | | | | Pre-Read Recognizing Letters | 3 of 4 | 4 | Yes |
| | | | | | | | | Pre-Read Recognizing Sounds | 3 of 4 | 1 | No |
| | | | | | | | | Pre-Read Middle Sounds | 3 of 4 | 1 | No |
| | | | | | | | | Graphic Information | 3 of 4 | 2 | No |
| | | | | | | | | Words in Context | 9 of 12 | 11 | Yes |
| | | | | | | | | Recall Information | 7 of 9 | 8 | Yes |
| | | | | | | | | Construct Meaning | 5 of 7 | 4 | No |
| 1385842 | Tesfaye, Aklilu D | TABE Reading | 9E | Y | 11/29/2012 | 2.8 | 425 | | | | |
| | | | | | | | | Graphic Information | 6 of 8 | 5 | No |
| | | | | | | | | Words in Context | 3 of 4 | 3 | Yes |
| | | | | | | | | Recall Information | 11 of 15 | 8 | No |
| | | | | | | | | Construct Meaning | 12 of 16 | 8 | No |
| | | | | | | | | Evaluate/Extend Meaning | 5 of 7 | 4 | No |
| 1385842 | Tesfaye, Aklilu D | TABE Reading | 10E | Y | 01/24/2013 | 2.3 | 398 | | | | |
| | | | | | | | | Graphic Information | 8 of 10 | 2 | No |
| | | | | | | | | Words in Context | 4 of 5 | 3 | No |
| | | | | | | | | Recall Information | 11 of 14 | 8 | No |
| | | | | | | | | Construct Meaning | 11 of 14 | 9 | No |
| | | | | | | | | Evaluate/Extend Meaning | 5 of 7 | 3 | No |
| 1385842 | Tesfaye, Aklilu D | TABE Reading | 9E | Y | 03/06/2013 | 3.3 | 440 | | | | |
| | | | | | | | | Graphic Information | 6 of 8 | 5 | No |
| | | | | | | | | Words in Context | 3 of 4 | 3 | Yes |
| | | | | | | | | Recall Information | 11 of 15 | 11 | Yes |
| | | | | | | | | Construct Meaning | 12 of 16 | 8 | No |
| | | | | | | | | Evaluate/Extend Meaning | 5 of 7 | 4 | No |
| 1385842 | Tesfaye, Aklilu D | TABE Reading | 10E | Y | 04/18/2013 | 2.7 | 421 | | | | |
| | | | | | | | | Graphic Information | 8 of 10 | 5 | No |
| | | | | | | | | Words in Context | 4 of 5 | 2 | No |
| | | | | | | | | Recall Information | 11 of 14 | 8 | No |
| | | | | | | | | Construct Meaning | 11 of 14 | 9 | No |
| | | | | | | | | Evaluate/Extend Meaning | 5 of 7 | 5 | Yes |
| 1385842 | Tesfaye, Aklilu D | TABE Reading | 9E | Y | 06/20/2013 | 3.6 | 450 | | | | |
| | | | | | | | | Graphic Information | 6 of 8 | 5 | No |
| | | | | | | | | Words in Context | 3 of 4 | 3 | Yes |
| | | | | | | | | Recall Information | 11 of 15 | 12 | Yes |
| | | | | | | | | Construct Meaning | 12 of 16 | 9 | No |
| | | | | | | | | Evaluate/Extend Meaning | 5 of 7 | 4 | No |

FOR OFFICIAL USE ONLY

EXHIBIT 6



February 28, 2014

Frank Cornish
North Texas Job Corps Center
1701 N. Church Street
McKinney, TX 75069

Re:     Gavin T. Mitchell's Completion

Dear Mr. Cornish,

Gavin T. Mitchell successfully completed the New Learning Resources School District's
requirements for a North New Summit High School Diploma on February 26, 2014. He is
a graduate of North New Summit School.


Should you have any questions, please feel free to contact me.



Sincerely,


Randell S. Douglas
Distance Learning Coordinator

1435 B Lelia Drive * Jackson, MS 39216 *(601) 982-8003 * Fax (601) 982-0083

# Center Information System
## North Texas Job Corps Center
### ALL TABE MATHEMATICS DIAGNOSTICS

| Stud Id | Stud Name | Test Type | Test Form | Valid Test | Test Date | Overal Grade | Overal Score | Objective | Passing Requirements | Correct No | Passed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 972892 | Mitchell, Gavin T | TABE Mathematics | 10D | Y | 05/29/2013 | 5.7 | 496 | | | | |
| | | | | | | | | Multiply Whole Numbers | 4 of 5 | 5 | Yes |
| | | | | | | | | Divide Whole Numbers | 4 of 5 | 2 | No |
| | | | | | | | | Decimals | 6 of 8 | 7 | Yes |
| | | | | | | | | Fractions | 6 of 8 | 2 | No |
| | | | | | | | | Integers | 7 of 9 | 6 | No |
| | | | | | | | | Percents | 4 of 5 | 0 | No |
| | | | | | | | | Number/Number Operations | 6 of 8 | 4 | No |
| | | | | | | | | Computation in Context | 4 of 5 | 2 | No |
| | | | | | | | | Estimation | 4 of 5 | 2 | No |
| | | | | | | | | Measurement | 5 of 6 | 0 | No |
| | | | | | | | | Geometry | 5 of 6 | 2 | No |
| | | | | | | | | Data Analysis | 5 of 6 | 4 | No |
| | | | | | | | | Statistics/Probability | 3 of 4 | 2 | No |
| | | | | | | | | Patterns/Functions/Algebra | 5 of 6 | 3 | No |
| | | | | | | | | Problem Solving | 3 of 4 | 3 | Yes |
| 972892 | Mitchell, Gavin T | TABE Mathematics | 9D | Y | 08/02/2013 | 5.1 | 478 | | | | |
| | | | | | | | | Multiply Whole Numbers | 4 of 5 | 4 | Yes |
| | | | | | | | | Divide Whole Numbers | 4 of 5 | 5 | Yes |
| | | | | | | | | Decimals | 6 of 8 | 7 | Yes |
| | | | | | | | | Fractions | 6 of 8 | 1 | No |
| | | | | | | | | Integers | 7 of 9 | 4 | No |
| | | | | | | | | Percents | 4 of 5 | 1 | No |
| | | | | | | | | Number/Number Operations | 6 of 8 | 2 | No |
| | | | | | | | | Computation in Context | 3 of 4 | 2 | No |
| | | | | | | | | Estimation | 4 of 5 | 1 | No |
| | | | | | | | | Measurement | 5 of 6 | 2 | No |
| | | | | | | | | Geometry | 5 of 6 | 2 | No |
| | | | | | | | | Data Analysis | 5 of 7 | 5 | Yes |
| | | | | | | | | Statistics/Probability | 3 of 4 | 0 | No |
| | | | | | | | | Patterns/Functions/Algebra | 5 of 6 | 2 | No |
| | | | | | | | | Problem Solving | 3 of 4 | 0 | No |
| 972892 | Mitchell, Gavin T | TABE Mathematics | 10M | Y | 11/11/2013 | 6.1 | 509 | | | | |
| | | | | | | | | Add Whole Numbers | 4 of 5 | 5 | Yes |
| | | | | | | | | Subtract Whole Numbers | 5 of 7 | 7 | Yes |
| | | | | | | | | Multiply Whole Numbers | 5 of 7 | 7 | Yes |
| | | | | | | | | Divide Whole Numbers | 5 of 6 | 4 | No |
| | | | | | | | | Decimals | 5 of 7 | 7 | Yes |
| | | | | | | | | Fractions | 6 of 8 | 3 | No |

## Center Information System
## North Texas Job Corps Center

| Stud id | Stud Name | Test Type | Test Form | Valid Test | Test Date | Overal Grade | Overal Score | Objective | Passing Requirements | Correct No | Passed |
|---------|-----------|-----------|-----------|------------|-----------|--------------|--------------|-----------|----------------------|-----------|--------|
| 972892 | Mitchell, Gavin T | TABE Mathematics | 10M | Y | 11/11/2013 | 6.1 | 509 | | | | |
| | | | | | | | | Number/Number Operations | 8 of 10 | 7 | No |
| | | | | | | | | Computation in Context | 4 of 5 | 5 | Yes |
| | | | | | | | | Estimation | 3 of 4 | 3 | Yes |
| | | | | | | | | Measurement | 5 of 6 | 3 | No |
| | | | | | | | | Geometry | 5 of 6 | 5 | Yes |
| | | | | | | | | Data Analysis | 5 of 6 | 3 | No |
| | | | | | | | | Statistics/Probability | 3 of 4 | 2 | No |
| | | | | | | | | Patterns/Functions/Algebra | 4 of 5 | 3 | No |
| | | | | | | | | Problem Solving | 3 of 4 | 1 | No |
| 972892 | Mitchell, Gavin T | TABE Mathematics | 9D | Y | 02/10/2014 | 6.0 | 508 | | | | |
| | | | | | | | | Multiply Whole Numbers | 4 of 5 | 4 | Yes |
| | | | | | | | | Divide Whole Numbers | 4 of 5 | 3 | No |
| | | | | | | | | Decimals | 6 of 8 | 6 | Yes |
| | | | | | | | | Fractions | 6 of 8 | 3 | No |
| | | | | | | | | Integers | 7 of 9 | 4 | No |
| | | | | | | | | Percents | 4 of 5 | 3 | No |
| | | | | | | | | Number/Number Operations | 6 of 8 | 3 | No |
| | | | | | | | | Computation in Context | 3 of 4 | 3 | Yes |
| | | | | | | | | Estimation | 4 of 5 | 4 | Yes |
| | | | | | | | | Measurement | 5 of 6 | 1 | No |
| | | | | | | | | Geometry | 5 of 6 | 3 | No |
| | | | | | | | | Data Analysis | 5 of 7 | 4 | No |
| | | | | | | | | Statistics/Probability | 3 of 4 | 0 | No |
| | | | | | | | | Patterns/Functions/Algebra | 5 of 6 | 2 | No |
| | | | | | | | | Problem Solving | 3 of 4 | 2 | No |
| 972892 | Mitchell, Gavin T | TABE Mathematics | 10D | Y | 03/25/2014 | 7.2 | 533 | | | | |
| | | | | | | | | Multiply Whole Numbers | 4 of 5 | 5 | Yes |
| | | | | | | | | Divide Whole Numbers | 4 of 5 | 4 | Yes |
| | | | | | | | | Decimals | 6 of 8 | 7 | Yes |
| | | | | | | | | Fractions | 6 of 8 | 1 | No |
| | | | | | | | | Integers | 7 of 9 | 9 | Yes |
| | | | | | | | | Percents | 4 of 5 | 3 | No |
| | | | | | | | | Number/Number Operations | 6 of 8 | 1 | No |
| | | | | | | | | Computation in Context | 4 of 5 | 3 | No |
| | | | | | | | | Estimation | 4 of 5 | 3 | No |
| | | | | | | | | Measurement | 5 of 6 | 2 | No |
| | | | | | | | | Geometry | 5 of 6 | 1 | No |
| | | | | | | | | Data Analysis | 5 of 6 | 6 | Yes |

Center Information System
North Texas Job Corps Center

| Stud Id | Stud Name | Test Type | Test Form | Valid Test | Test Date | Overal Grade | Overal Score | Objective | Passing Requirements | Correct No | Passed |
|---------|-----------|-----------|-----------|------------|-----------|--------------|--------------|-----------|----------------------|-----------|--------|
| 972892 | Mitchell, Gavin T | TABE Mathematics | 10D | Y | 03/25/2014 | 7.2 | 533 | | | | |
| | | | | | | | | Statistics/Probability | 3 of 4 | 0 | No |
| | | | | | | | | Patterns/Functions/Algebra | 5 of 6 | 5 | Yes |
| | | | | | | | | Problem Solving | 3 of 4 | 4 | Yes |

FOR OFFICIAL USE ONLY

EXHIBIT 7



April 23, 2014

Frank Cornish
North Texas Job Corps Center
1701 N. Church Street
McKinney, TX 75069

Re:    Maria Kirk's Completion

Dear Mr. Cornish,

Maria Kirk successfully completed the New Learning Resources School District's requirements for a North New Summit High School Diploma on April 22, 2014. She is a graduate of North New Summit School.

Should you have any questions, please feel free to contact me.

Sincerely,

Randell S. Douglas
Distance Learning Coordinator

1435 B Lelia Drive * Jackson, MS 39216 *(601) 982-8003 * Fax (601) 982-0083

**Center Information System**
**North Texas Job Corps Center**
**ALL TABE READING DIAGNOSTICS**

| Stud id | Stud Name | Test Type | Test Form | Valid Test | Test Date | Overal Grade | Overal Score | Objective | Passing Requirements | Correct No | Passed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1406394 | Kirk, Maria G | TABE Reading | 10M | Y | 06/13/2013 | 5.4 | 502 | | | | |
| | | | | | | | | Graphic Information | 3 of 4 | 1 | No |
| | | | | | | | | Words in Context | 5 of 6 | 4 | No |
| | | | | | | | | Recall Information | 10 of 13 | 11 | Yes |
| | | | | | | | | Construct Meaning | 13 of 17 | 11 | No |
| | | | | | | | | Evaluate/Extend Meaning | 8 of 10 | 8 | Yes |
| 1406394 | Kirk, Maria G | TABE Reading | 9D | Y | 08/13/2013 | 5.2 | 497 | | | | |
| | | | | | | | | Graphic Information | 3 of 4 | 2 | No |
| | | | | | | | | Words in Context | 3 of 4 | 1 | No |
| | | | | | | | | Recall Information | 10 of 13 | 7 | No |
| | | | | | | | | Construct Meaning | 13 of 17 | 11 | No |
| | | | | | | | | Evaluate/Extend Meaning | 9 of 12 | 7 | No |
| 1406394 | Kirk, Maria G | TABE Reading | 10M | Y | 11/05/2013 | 6.4 | 528 | | | | |
| | | | | | | | | Graphic Information | 3 of 4 | 1 | No |
| | | | | | | | | Words in Context | 5 of 6 | 4 | No |
| | | | | | | | | Recall Information | 10 of 13 | 13 | Yes |
| | | | | | | | | Construct Meaning | 13 of 17 | 14 | Yes |
| | | | | | | | | Evaluate/Extend Meaning | 8 of 10 | 8 | Yes |
| 1406394 | Kirk, Maria G | TABE Reading | 9D | Y | 02/06/2014 | 5.8 | 513 | | | | |
| | | | | | | | | Graphic Information | 3 of 4 | 2 | No |
| | | | | | | | | Words in Context | 3 of 4 | 1 | No |
| | | | | | | | | Recall Information | 10 of 13 | 10 | Yes |
| | | | | | | | | Construct Meaning | 13 of 17 | 9 | No |
| | | | | | | | | Evaluate/Extend Meaning | 9 of 12 | 9 | Yes |
| 1406394 | Kirk, Maria G | TABE Reading | 10D | Y | 04/22/2014 | 5.7 | 511 | | | | |
| | | | | | | | | Graphic Information | 4 of 5 | 3 | No |
| | | | | | | | | Words in Context | 3 of 4 | 3 | Yes |
| | | | | | | | | Recall Information | 11 of 15 | 14 | Yes |
| | | | | | | | | Construct Meaning | 10 of 13 | 5 | No |
| | | | | | | | | Evaluate/Extend Meaning | 10 of 13 | 7 | No |

FOR OFFICIAL USE ONLY

# EXHIBIT 8

* * * COMMUNICATION RESULT REPORT ( MAY. 31. 2013 12:47PM ) * * *

FAX HEADER 1:  EVEREST DALLAS
FAX HEADER 2:

TRANSMITTED/STORED : MAY. 31. 2013 12:40PM

| FILE | MODE | OPTION | ADDRESS | RESULT | PAGE |
|------|------|--------|---------|--------|------|
| 5562 | MEMORY TX | | 9725477702 | E-3) 3) | 0/1 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

MAY-31-2013 09:11A FROM:                                TO:012143630041          P.2/2



# Educational Institution Placement Verification Form

A former Job Corps student, **Jasmine Broadus**, Social Security number **XXX-XX-0838**, has informed us that (s)he is enrolled at your educational institution. Job Corps, a federally funded training program administered by the US Department of Labor, requires that we obtain written confirmation of all school placements for former participants. Therefore, we are respectfully requesting that you complete and sign all sections of this form and submit it to us at the address or fax number provided below within 48 hours of its receipt.

Please indicate the class start date of the first week following **03-25-13** in which the student satisfied enrollment requirements.

**THANK YOU FOR ASSISTING US IN HELPING TODAY'S YOUTH!**

## EDUCATIONAL INSTITUTION'S INFORMATION

School/Program Name:

Address:

City/State/Zip:    *No Student Found a Everest*

Telephone Number:    *College Dallas to this name*    Fax:

| Class Start Date: _____ | If GED, High School, Vocational Training, or Trade School please indicate the beginning/end dates of the first week in which the student completed class(es) (within seven consecutive days) |
|---|---|
| | From_____ TO_____ |
| **Expected Duration of class or program (please state in days, months, semesters, quarters, or years):** _____ | If college/university, how many credit hours taken per quarter/semester: _____ |
| If GED, High School, Vocational Training, or Trade School how many hours per WEEK does student attend: | |

Printed name of individual verifying placement:

Verifier's Signature:    _Paul MacLean_

Verifier's Title:    Date Signed: _5/31/13_

| **Please affix your business card or stamp here or copy this entire form onto your letterhead to validate:** | Dean Tinnell,Ca 214.869.1854 cell 972.547.7700 Fax |
|---|---|

# EXHIBIT 9

*Student never worked at Gunslinger 7/23/12*

09/23/2013 20:20:28

**U.S. Department of Labor**
**Employment and Training Administration**

Career Transition System

OMB Approval No: 1205-0035
Expiration Date: 1/31/2014

**JOB CORPS PLACEMENT RECORD**

| 1. STUDENT ID | 2A. LAST NAME | 2B. FIRST NAME | 2C. MI | 3. SEX | 4. PHONE NO. |
|---|---|---|---|---|---|
| 1303978 | Lane | Cory | A | Male | ▓▓▓▓ |

| 5A. STREET ADDRESS, CITY, STATE, ZIPCODE | 5B. EMAIL |
|---|---|
| ▓▓▓▓ | ▓▓▓▓ |

| 6. SEPARATION DATE | | | 7. DATE OF BIRTH | | | 8. CENTER | 9. ASGN | 10. GED | 11. COMPLETION | 12. GRAD STAT |
|---|---|---|---|---|---|---|---|---|---|---|
| MO | DAY | YEAR | MO | DAY | YEAR | North Texas | | High School Diploma Obtained ( | Yes | Yes |
| 5 | 30 | 2012 | ▓▓ | ▓▓ | ▓▓ | | | | | |

**13. STUDENT CAREER TECHNICAL TRAINING**

| A. TAR Code | Title | C. TPA | B. Training Provider |
|---|---|---|---|
| 63047JA | Security & Protective Services | SECUR | 01 Center Training Program |

**14. STUDENT'S PLACEMENT STATUS ON DATE THIS FORM COMPLETED**

| PLACEMENT STATUS: 03 | 01 One Full Time Job | 06 Full Time Job/College Combo | 11 OJT/Subsidized Employment | 16 NP Not Seeking Placement | 15. CTS CODE |
|---|---|---|---|---|---|
| | 02 Two Full Time Jobs | 07 Part Time Job/College Combo | 12 Other Training Program | 17 NP Cannot Locate | TXCONT |
| | 03 One Part Time Job | 08 High School | 13 NP Family Obligations | 18 NP Other | 16. INITIAL PLACEMENT |
| | 04 Two Part Time Jobs | 09 Post Secondary School/Training | 14 NP Reentered Job Corps | 21 NP Referred to One-Step Ctr | Yes |
| | 05 Armed Forces | 10 College | 15 NP Seeking Placement | 22 NP Referred to other agency | |

**17. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (FIRST)**

| A. Registered Apprenticeship | B. ONET SOC | D. Hours | E. Hourly Wage | F. Job Title (According To Employer) | G. JTM? |
|---|---|---|---|---|---|
| No | 33-9032.00 - Security Guards | 24 | $9.50 | security | Yes |

**18. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (FIRST)**

| A. Name Gunslinger Inc | D. Area Code & Phone No. (972) 494-9113 | F. Email | **19. NON-PLACER** Placed By: |
|---|---|---|---|
| B. Number and Street Address 3701 Dividend | E. Fax No. | G. Web Site | |
| C. City, State, ZIP Code Garland TX 75042 | | | |

**20. PLACEMENT VERIFICATION (FIRST)**

A. CONFIRMATION OF PLACEMENT / SELF - EMPLOYMENT STATUS

| Name rodgers, brad | Title mgr | Phone No. (972) 494-9113 | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| | | | MO | DAY | YEAR |
| | | | 12 | 31 | 2012 |

| B. OTHER/COMMENTS | D. DATE STUDENT PLACED | | |
|---|---|---|---|
| | MO | DAY | YEAR |
| | 1 | 31 | 2013 |

| 21. NAME AND TITLE OF OFFICIAL VERIFYING PLACEMENT (FIRST) | 22. SIGNATURE | 23. VERIFICATION TYPE | 24. DATE PLACEMENT VERIFIED | | |
|---|---|---|---|---|---|
| Tinnell, Dean - Career Advisor | | | MO | DAY | YEAR |
| | | | 1 | 31 | 2013 |

**25. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (SECOND)**

| A. ONET SOC | C. Hours | D. Hourly Wage | E. Job Title (According To Employer) | F. JTM? |
|---|---|---|---|---|
| | | | | |

**26. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (SECOND)**

| A. Name | D. Area Code & Phone No. | F. Email | **27. NON-PLACER** Placed By: |
|---|---|---|---|
| B. Number and Street Address | E. Fax No. | G. Web Site | |
| C. City, State, ZIP Code | | | |

**28. PLACEMENT VERIFICATION (SECOND)**

A. CONFIRMATION OF PLACEMENT / SELF - EMPLOYMENT STATUS

| ame | Title | Phone No. | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| | | | MO | DAY | YEAR |

| B. OTHER/COMMENTS | D. DATE STUDENT PLACED | | |
|---|---|---|---|
| | MO | DAY | YEAR |

# EXHIBIT 10

Career Transition System

07/08/2013 18:31:51

U.S. Department of Labor
Employment and Training Administration

OMB Approval No: 1205-0035

Expiration Date: 1/31/2014

JOB CORPS PLACEMENT RECORD

| 1. STUDENT ID | 2A. LAST NAME | 2B. FIRST NAME | 2C. MI | 3. SEX | 4. PHONE NO. |
|---|---|---|---|---|---|
| 1262916 | Moore | Patrick | | Male | |

| 6A. STREET ADDRESS, CITY, STATE, ZIPCODE | | 5B. EMAIL |
|---|---|---|
| | | |

| 6. SEPARATION DATE | | | 7. DATE OF BIRTH | | | 8. CENTER | 9. ASGN | 10. GED | 11. COMPLETION | 12. GRAD STAT |
|---|---|---|---|---|---|---|---|---|---|---|
| MO | DAY | YEAR | MO | DAY | YEAR | North Texas | | High School Diploma Obtained ( | Yes | Yes |
| 5 | 20 | 2012 | | | | | | | | |

**13. STUDENT CAREER TECHNICAL TRAINING**

| A. TAR Code | Title | C. TPA | B. Training Provider |
|---|---|---|---|
| 63047JA | Security & Protective Services | SECUR | 01 Center Training Program |

**14. STUDENT'S PLACEMENT STATUS ON DATE THIS FORM COMPLETED**

| | | 15. CTS CODE |
|---|---|---|
| PLACEMENT STATUS: 03 | 01 One Full Time Job   06 Full Time Job/College Combo   11 OJT/Subsidized Employment   16 NP Not Seeking Placement<br>02 Two Full Time Jobs   07 Part Time Job/College Combo   12 Other Training Program   17 NP Cannot Locate<br>03 One Part Time Job   08 High School   13 NP Family Obligations   18 NP Other<br>04 Two Part Time Jobs   09 Post Secondary School/Training   14 NP Reentered Job Corps   21 NP Referred to One-Stop Ce<br>05 Armed Forces   10 College   15 NP Seeking Placement   22 NP Referred to other agency | TXCONT<br>**16. INITIAL PLACEMENT**<br>Yes |

**17. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (FIRST)**

| A. Registered Apprenticeship | B. ONET SOC | D. Hours | E. Hourly Wage | F. Job Title (According To Employer) | G. JTM? |
|---|---|---|---|---|---|
| No | 33-9032.00 - Security Guards | 30 | $9.75 | security guard | Yes |

**18. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (FIRST)**

| | | | 19. NON-PLACER |
|---|---|---|---|
| A. Name<br>Maxey Security | D. Area Code & Phone No.<br>(214) 371-0863 | F. Email | Placed By: |
| B. Number and Street Address<br>2035 Canada Dr | E. Fax No. | G. Web Site | |
| C. City, State, ZIP Code<br>Dallas TX 75212 | | | |

**20. PLACEMENT VERIFICATION (FIRST)**

| A. CONFIRMATION OF PLACEMENT / SELF - EMPLOYMENT STATUS | | | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| Name<br>maxey, shucore | Title<br>assistant | Phone No.<br>(214) 371-0863 | MO | DAY<br>15 | YEAR<br>2013 |
| B. OTHER/COMMENTS<br>Spoke To Mr Maxey-Graduate Work | | | D. DATE STUDENT PLACED | | |
| | | | MO | DAY<br>5 | YEAR<br>2013 |

| 21. NAME AND TITLE OF OFFICIAL VERIFYING PLACEMENT (FIRST) | 22. SIGNATURE | 23. VERIFICATION TYPE | 24. DATE PLACEMENT VERIFIED | | |
|---|---|---|---|---|---|
| Tinnell Dean - Career Advisor | | | MO | DAY<br>5 | YEAR<br>2013 |

**25. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (SECOND)**

| A. ONET SOC | C. Hours | D. Hourly Wage | E. Job Title (According To Employer) | F. JTM? |
|---|---|---|---|---|
| | | | | |

**26. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (SECOND)**

| | | | 27. NON-PLACER |
|---|---|---|---|
| A. Name | D. Area Code & Phone No. | F. Email | Placed By: |
| B. Number and Street Address | E. Fax No. | G. Web Site | |
| C. City, State, ZIP Code | | | |

**28. PLACEMENT VERIFICATION (SECOND)**

| A. CONFIRMATION OF PLACEMENT / SELF - EMPLOYMENT STATUS | | | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| ame | Title | Phone No. | MO | DAY | YEAR |
| B. OTHER/COMMENTS | | | D. DATE STUDENT PLACED | | |
| | | | MO | DAY | YEAR |

| 29. NAME AND TITLE OF OFFICIAL VERIFYING PLACEMENT (SECOND) | 30. SIGNATURE | 31. VERIFICATION TYPE | 32. DATE PLACEMENT VERIFIED | | |
|---|---|---|---|---|---|
| | | | MO | DAY | YEAR |

FROM FANNI NDEL ISD

EXHIBIT 11

Career Transition System

07/24/2013 12:48:47

**U.S. Department of Labor**
**Employment and Training Administration**

**JOB CORPS PLACEMENT RECORD**

OMB Approval No: 1205-0035
Expiration Date: 1/31/2014

| 1. STUDENT ID | 2A. LAST NAME | 2B. FIRST NAME | 2C. MI | 3. SEX | 4. PHONE NO. |
|---|---|---|---|---|---|
| 1243735 | Rials | Randi | P | Female | |

| 5A. STREET ADDRESS, CITY, STATE, ZIPCODE | 5B. EMAIL |
|---|---|
| | |

| 6. SEPARATION DATE | 7. DATE OF BIRTH | 8. CENTER | 9. ASGN | 10. GED | 11. COMPLETION | 12. GRAD STAT |
|---|---|---|---|---|---|---|
| MO DAY YEAR<br>2   29   2012 | MO DAY YEAR | North Texas | | High School Diploma Obtained ( | Yes | Yes |

**13. STUDENT CAREER TECHNICAL TRAINING**

| A. TAR Code | Title | C. TPA | B. Training Provider |
|---|---|---|---|
| 63047JA | Security & Protective Services | SECUR | 01 Center Training Program |

**14. STUDENT'S PLACEMENT STATUS ON DATE THIS FORM COMPLETED**

| PLACEMENT STATUS: 03 | 01 One Full Time Job | 06 Full Time Job/College Combo | 11 OJT/Subsidized Employment | 16 NP Not Seeking Placement | **15. CTS CODE** TXCONT |
|---|---|---|---|---|---|
| | 02 Two Full Time Jobs | 07 Part Time Job/College Combo | 12 Other Training Program | 17 NP Cannot Locate | **16. INITIAL PLACEMENT** |
| | 03 One Part Time Job | 08 High School | 13 NP Family Obligations | 18 NP Other | |
| | 04 Two Part Time Jobs | 09 Post Secondary School/Training | 14 NP Reentered Job Corps | 21 NP Referred to One-Stop Ctr | Yes |
| | 05 Armed Forces | 10 College | 15 NP Seeking Placement | 22 NP Referred to other agency | |

**17. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (FIRST)**

| A.Registered Apprenticeship<br>No | B. ONET SOC<br>33-9032.00 - Security Guards | D. Hours<br>20 | E. Hourly Wage<br>$9.00 | F. Job Title (According To Employer)<br>security guard | G. JTM?<br>Yes |
|---|---|---|---|---|---|

**18. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (FIRST)**

| A. Name<br>Dog World Services | D. Area Code & Phone No. | F. Email | **19. NON-PLACER** Placed By: |
|---|---|---|---|
| B. Number and Street Address<br>351 W. Jefferson Blvd. | E. Fax No. | G. Web Site | |
| C. City, State, ZIP Code<br>Dallas TX 75208 | | | |

**20. PLACEMENT VERIFICATION (FIRST)**

| A. CONFIRMATION OF PLACEMENT / SELF - EMPLOYMENT STATUS | | | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| Name<br>Jones, Angellel | Title<br>office admn | Phone No.<br>(214) 946-3647 | MO<br>6 | DAY<br>8 | YEAR<br>2012 |
| B. OTHER/COMMENTS | | | D. DATE STUDENT PLACED | | |
| | | | MO<br>6 | DAY<br>14 | YEAR<br>2012 |

| 21. NAME AND TITLE OF OFFICIAL VERIFYING PLACEMENT (FIRST) | 22.SIGNATURE | 23.VERIFICATION TYPE | 24. DATE PLACEMENT VERIFIED | | |
|---|---|---|---|---|---|
| Tinnell, Dean - Career Advisor | | | MO<br>6 | DAY<br>14 | YEAR<br>2012 |

**25. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (SECOND)**

| A. ONET SOC | C. Hours | D. Hourly Wage | E. Job Title (According To Employer) | F. JTM? |
|---|---|---|---|---|
| | | | | |

**26. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (SECOND)**

| A. Name | D. Area Code & Phone No. | F. Email | **27. NON-PLACER** Placed By: |
|---|---|---|---|
| B. Number and Street Address | E. Fax No. | G. Web Site | |
| C. City, State, ZIP Code | | | |

**28. PLACEMENT VERIFICATION (SECOND)**

| A. CONFIRMATION OF PLACEMENT / SELF - EMPLOYMENT STATUS | | | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| Name | Title | Phone No. | MO | DAY | YEAR |
| B. OTHER/COMMENTS | | | D. DATE STUDENT PLACED | | |
| | | | MO | DAY | YEAR |

| 29. NAME AND TITLE OF OFFICIAL VERIFYING PLACEMENT (SECOND) | 30.SIGNATURE | 31.VERIFICATION TYPE | 32. DATE PLACEMENT VERIFIED | | |
|---|---|---|---|---|---|
| | | | MO | DAY | YEAR |

FROM FANNI NDEL ISD

Exhibit 12

 

**U.S. Department of Labor**
**Employment and Training Administration**

07/11/2013 17:52:01

OMB Approval No: 1205-0035
Expiration Date: 1/31/2014

## JOB CORPS PLACEMENT RECORD

| 1. STUDENT ID | 2A. LAST NAME | 2B. FIRST NAME | 2C. MI | 3. SEX | 4. PHONE NO. |
|---|---|---|---|---|---|
| 1225756 | Cornelius | Duaine | V | Male | |

| 5A. STREET ADDRESS, CITY, STATE, ZIPCODE | 6B. EMAIL |
|---|---|
| | |

| 6. SEPARATION DATE | | | 7. DATE OF BIRTH | | | 8. CENTER | 9. ASGN | 10. GED | 11. COMPLETION | 12. GRAD STAT |
|---|---|---|---|---|---|---|---|---|---|---|
| MO | DAY | YEAR | MO | DAY | YEAR | North Texas | | Passed GED Test. | Yes | Yes |
| 10 | 28 | 2011 | | | | | | | | |

### 13. STUDENT CAREER TECHNICAL TRAINING

| A. TAR Code | Title | C. VPA | B. Training Provider |
|---|---|---|---|
| 63047JC | Homeland Security | SECUR | 01 Center Training Program |

### 14. STUDENT'S PLACEMENT STATUS ON DATE THIS FORM COMPLETED

PLACEMENT STATUS:

03

01 One Full Time Job
02 Two Full Time Jobs
03 One Part Time Job
04 Two Part Time Jobs
05 Armed Forces
06 Full Time Job/College Combo
07 Part Time Job/College Combo
08 High School
09 Post Secondary School Training
10 College
11 OJT/Subsidized Employment
12 Other Training Program
13 NP Family Obligations
14 NP Reentered Job Corps
15 NP Seeking Placement
16 NP Not Seeking Placement
17 NP Cannot Locate
18 NP Other
21 NP Referred to One-Stop Ctr
22 NP Referred to other agency

| 15. CTS CODE |
|---|
| TXCONT |

| 16. INITIAL PLACEMENT |
|---|
| Yes |

### 17. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (FIRST)

| A. Registered Apprenticeship | B. ONET SOC | D. Hours | E. Hourly Wage | F. Job Title (According To Employer) | G. JTM? |
|---|---|---|---|---|---|
| No | 33-9032.00 - Security Guards | 20 | $9.00 | security guard | Yes |

### 18. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (FIRST)

| A. Name | D. Area Code & Phone No. | F. Email |
|---|---|---|
| tog World Services | | |
| B. Number and Street Address | E. Fax No. | G. Web Site |
| 351 W. Jefferson Blvd. | | |
| C. City, State, ZIP Code | | |
| Dallas TX 75208 | | |

| 19. NON-PLACER |
|---|
| Placed By: |

### 20. PLACEMENT VERIFICATION (FIRST)

| A. CONFIRMATION OF PLACEMENT / SELF-EMPLOYMENT STATUS | | | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| Name | Title | Phone No. | MO | DAY | YEAR |
| Jones, Angellet | office firm | (214) 946-3547 | 6 | 8 | 2012 |
| B. OTHER/COMMENTS | | | D. DATE STUDENT PLACED | | |
| | | | MO | DAY | YEAR |
| | | | 6 | 14 | 2012 |

| 21. NAME AND TITLE OF OFFICIAL VERIFYING PLACEMENT (FIRST) | 22.SIGNATURE | 23.VERIFICATION TYPE | 24. DATE PLACEMENT VERIFIED | | |
|---|---|---|---|---|---|
| Tinnell, Dean - Career Advisor | | | MO | DAY | YEAR |
| | | | 6 | 14 | 2012 |

### 25. JOB, SCHOOL, MILITARY OR NOT PLACED INFORMATION (SECOND)

| A. ONET SOC | C. Hours | D. Hourly Wage | E. Job Title (According to Employer) | F. JTM? |
|---|---|---|---|---|
| | | | | |

### 26. EMPLOYER, SCHOOL OR INSTITUTIONAL TRAINING PROGRAM (SECOND)

| A. Name | D. Area Code & Phone No. | F. Email |
|---|---|---|
| | | |
| B. Number and Street Address | E. Fax No. | G. Web Site |
| | | |
| C. City, State, ZIP Code | | |

| 27. NON-PLACER |
|---|
| Placed By: |

### 28. PLACEMENT VERIFICATION (SECOND)

| A. CONFIRMATION OF PLACEMENT / SELF-EMPLOYMENT STATUS | | | C. DATE STUDENT REPORTED | | |
|---|---|---|---|---|---|
| me | Title | Phone No. | MO | DAY | YEAR |
| B. OTHER/COMMENTS | | | D. DATE STUDENT PLACED | | |
| | | | MO | DAY | YEAR |

| 29. NAME AND TITLE OF OFFICIAL VERIFYING PLACEMENT (SECOND) | 30.SIGNATURE | 31.VERIFICATION TYPE | 32. DATE PLACEMENT VERIFIED | | |
|---|---|---|---|---|---|
| | | | MO | DAY | YEAR |

FROM FANNI NOEL ISD