# United States District Court
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHAEL JAMISON, GREGORY DEAN TINNELL, EARNEST HUNTER, & DOROTHY WILLIAMS | § § § § § § § | |
| v. | § | CIVIL ACTION NO. 3:16-CV-3248-S |
| CAREER OPPORTUNITIES, INC. | § § § § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendant Career Opportunities, Inc.'s ("Defendant" or "COI") Motion to Dismiss for Failure to State a Claim [ECF No. 34]. For the reasons stated below, the Motion is granted.

### I. BACKGROUND

Relators Michael Jamison, Gregory Dean Tinnell, Earnest Hunter, and Dorothy Williams (collectively, "Relators") brought the instant qui tam action for alleged violations of the False Claims Act ("FCA") by Defendant. Pursuant to Special Order 3-318, this case was transferred from the docket of Judge Sidney A. Fitzwater to the docket of this Court on March 8, 2018.

#### A. *The North Texas Job Corps Center*[1]

Job Corps is a program created by the Workforce Investment Act of 1998. Second Am. Compl. ¶ 13. Its purpose is to provide educational and vocational skills, training, and support services through a nationwide network of campuses, known as Job Corps Centers ("Centers"). *Id.* Private companies submit bid proposals to the United States Department of Labor ("DOL") to

---

[1] The facts set forth in this Order are taken from Relators' Second Amended Complaint.

operate and manage Job Corps programs through Centers. *Id.* ¶ 14. One such Center is the North Texas Job Corps Center in McKinney, Texas ("NTJCC"). *Id.* Companies awarded contracts are referred to as "operators" and are required to follow the mandates of 29 U.S.C. § 2881 et seq., 20 C.F.R. Parts 638 and 670, the DOL Job Corps Office "Policy and Requirements Handbook," and guidelines and procedures established by the Secretary of Labor. *Id.*

Each Center's performance is compared with the performance of all Centers nationwide. *Id.* ¶ 15. Performance is measured by metrics such as total number of students enrolled, students' achievement of academic and vocational credentials, and initial and ongoing job placements. *Id.* Operators can receive performance-based fees, bonuses, and contract extensions if their Center has a favorable rating compared to other Centers. *Id.* ¶ 16. The rating is based on data provided by the Center to the DOL. *Id.* If a Center fails to meet expected levels of performance, the DOL can change the management staff, replace the operator, relocate the Center, or close the center. *Id.* ¶ 30.

Relators contend that all Centers are required to enforce the following policies: (1) students must meet certain qualifications for enrollment; (2) students are subject to a zero-tolerance policy regarding use of drugs and other controlled substances, commission of acts of violence against other students, and "engagement in inappropriate sexual behavior"; and (3) students must perform satisfactorily on end-of-course assessments to receive a high school diploma. *Id.* ¶¶ 17, 20.

In 2003, Fluor Corporation ("Fluor") acquired Del-Jen, Inc. ("DJI"). *Id.* ¶ 21. At that time, DJI was a leading provider of education and training services to the DOL, especially through its Job Corps programs. *Id.* Around August 31, 2010, Defendant was awarded a $95 million contract from the DOL to manage and operate the NTJCC. *Id.* ¶ 25. On October 1, 2010, DJI and Defendant entered into the Subcontract Agreement regarding the operation of the NTJCC. *Id.* ¶

2

26. The Subcontract Agreement noted that, while the DOL contract was awarded to COI, "COI and DJI recognize that the combination of their joint experience and skills contributed to the award of the Contract and will be essential in the successful performance of the Contract." Second Am. Compl. Ex. ("Relators' Ex.") 3. Under the Subcontract Agreement, Defendant was the prime contractor, and DJI was the subcontractor. *Id.* art. 2. Prior to this submission, Defendant had never received a contract to manage and operate a Center. Second Am. Compl. ¶ 26. DJI, on the other hand, was operating at least four other Centers. *Id.*

At the time of the submission, Lana Kite was the principal/owner of Defendant and had an existing working relationship with DJI. *Id.* ¶ 27. According to Relators, Kite "caused DJI to employ [Maria] Martin for the NTJCC despite the fact[] that" Martin allegedly had no prior experience with Job Corps or other relevant experience.[2] *Id.* ¶ 28. Kite allegedly "used and relied on Martin to be the on-site point person for Kite at the NTJCC." *Id.* Relators contend that Martin "dictated daily operations and policy to DJI and COI." *Id.*

Per the governing statute, Defendant was required to report performance-related information on the operations of the NTJCC. *Id.* ¶ 29. That information was used to compare the performance of the NTJCC with the performance of other Centers. *Id.* As of 2011, the NTJCC received $37,880 per enrolled student and $76,574 for each student that graduated with a diploma, GED, or trade certificate and was placed in a job. *Id.* ¶ 31.

### B. *The Alleged Scheme*

Around October 1, 2010, Kite allegedly held a meeting with Martin, Kathy Adams, Eddie Williams, and Tommy Johnson[3] at a restaurant in McKinney. *Id.* ¶ 41. Relators allege that, at the

---

[2] Relators do not state what Martin's job title was at the time of her hiring. They only allege that "Martin was the alter ego of Kite at [the] NTJCC regardless of her title." Second Am. Compl. ¶ 28.
[3] Relators do not state what role Adams, Williams, and Johnson played at the NTJCC.

3

meeting, Kite discussed how to submit fraudulent reports to the DOL for payment. *Id.* "Kite explained that they would bill the DOL two times a month and that the government would pay within 30 days." *Id.* Submission for payment was to be done on Office of Job Corps Form 2110. *Id.* Kite allegedly explained that Defendant was technically the contractor that received the DOL contract but that DJI was to be the true administrator and manager of NTJCC. *Id.* According to Relators, Kite then told everyone that Martin was her "right hand" and had full authority for operations at the NTJCC. *Id.*

Kite further explained that the NTJCC would be operated in a departmental fashion and that there would be four departments: admissions, security, education, and post-graduation/certification job placement. *Id.* Each department would be responsible for submissions every two weeks. *Id.* Kite or Martin would review and certify the departmental submissions before formally sending them to the DOL for payment. *Id.* According to Relators,

> Kite informed the meeting that it was a numbers game and it did not matter if any of the students were qualified to be at the [NTJCC], actually received an education or were actually placed in a job, the most important thing was to prevent any disclosure to the DOL or disclosure of any problems at the [NTJCC] to local authorities.

*Id.* Relators allege that Kite explained the problems created at one of DJI's other Centers when the Office of Inspector General audited the Center and found violence and drug problems. *Id.* As discussed below, Relators contend that each department submitted false claims via the departmental submission procedure.

### C. *Procedural History*

On November 19, 2013, Relators filed their original complaint in *United States ex rel. Jamison v. Del-Jen, Inc.*[4] They named DJI and COI as defendants. On November 20, 2014, the

---

[4] Civ. A. No. 3:13-CV-4616-L (N.D. Tex. filed Nov. 19, 2013).

United States filed a Notice of Election to Decline Intervention. On September 16, 2016, Judge Sam A. Lindsay dismissed COI from the lawsuit because Relators failed to timely serve COI.[5] *United States ex rel. Jamison v. Career Opportunities, Inc.*, Civ. A. No. 3:13-CV-4616-L, 2016 WL 8730531 (N.D. Tex. Sept. 16, 2016). On November 18, 2016, Relators filed the instant action against COI. On May 12, 2017, the United States filed a Notice of Election to Decline Intervention. *See* ECF No. 7. On August 16, 2017, COI filed a motion to dismiss. Relators filed the Amended Complaint on September 12, 2017. COI filed a second motion to dismiss on October 3, 2017. Without ruling on that motion, the Court granted Relators leave to amend. Relators filed the Second Amended Complaint on August 14, 2018. COI filed its third Motion to Dismiss on August 28, 2018.

## II. LEGAL STANDARDS

### A. *Rule 12(b)(6)*

To defeat a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 742 (5th Cir. 2008). To meet this "facial plausibility" standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility does not require probability, but a plaintiff must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The court must accept well-pleaded facts as true and view them in the light most

---

[5] Judge Lindsay ultimately dismissed the lawsuit against DJI as well, and the Fifth Circuit affirmed his decision. *United States ex rel. Jamison v. Del-Jen, Inc.*, Civ. A. No. 3:13-CV-4616-L, 2017 WL 958604 (N.D. Tex. Mar. 13, 2017), *aff'd*, 747 F. App'x 216 (5th Cir. 2018). Judge Lindsay based his dismissal in large part on the fact that Relators provided only general and conclusory allegations. *Id.* at *1, *4.

favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). However, the court does not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (internal citations omitted).

The ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). At the motion to dismiss stage, the court does not evaluate the plaintiff's likelihood of success. It only determines whether the plaintiff has stated a claim upon which relief can be granted. *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977).

### B. *Rule 9(b)*

When a complaint alleges fraud, the plaintiff must plead the elements of its claims with the heightened particularity required by Rule 9(b). *See, e.g., Coates v. Heartland Wireless Commc'ns, Inc.*, 26 F. Supp. 2d 910, 914 (N.D. Tex. 1998). Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). Put simply, Rule 9(b) requires the "who, what, when, where, and

how" of the fraud. *U.S. ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

Claims brought under the FCA must satisfy the strictures of Rule 9(b). *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354, 365 (5th Cir. 2014). However, "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009). If a relator "cannot allege the details of an actually submitted false claim," the relator must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Id.*

### III. ANALYSIS

Defendant moves to dismiss all three counts of the Second Amended Complaint, arguing that Relators have failed to satisfy the pleading standards of Rules 12(b)(6) and 9(b).

#### A. *Presentment Claim*

A claim under 31 U.S.C. § 3729(a)(1)(A) arises when a person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." "[T]he provision's *sine qua non* is the presentment of a false claim." *Grubbs*, 565 F.3d at 188. The FCA "attaches liability, not to the underlying fraudulent activity . . . but to the claim for payment." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

In the instant case, the alleged billing scheme was carried out through the submission of Form 2110 (and, perhaps, other reports) to the DOL. According to Relators,

> Relators have explained in great detail the overall scheme involved: submission of claims for payment that represented that more students were enrolled than were qualified[;] omission of reports of repeated, daily violations of the "zero tolerance"

7

policy ... that would have drastically reduced the number of students enrolled; and reporting of job placements containing 80% misrepresentations regarding numbers of students placed.

Resp. 14.

### i. *COI and DJI*

Relators contend that the purported scheme to submit false claims was jointly carried out by Defendant and DJI. However, they assert that Defendant remained responsible for submission of claims to the DOL. Relators note that "certain roles and functions were delegated to [DJI]" but that false certifications submitted by a subcontractor (DJI) still subject the contractor (Defendant) to liability. Resp. 14-15 (citing *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008)). The Court disagrees with Relators' interpretation of *Allison Engine*.[6] In that case, the Supreme Court noted that "a subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." *Allison Engine*, 553 U.S. at 671. This statement supports a finding of subcontractor liability, not contractor liability. Defendant is not liable for false statements submitted by DJI solely by virtue of the subcontractor-contractor relationship.

Without a basis for imputation of liability, it is unclear from the Second Amended Complaint which entity was responsible for which submissions. As was the case in Relators' former action against Defendant and DJI, the Second Amended Complaint "often blurs the distinction as to which [entity] is allegedly committing the fraudulent action." *United States ex rel. Jamison v. Career Opportunities*, Civ. A. No. 3:13-CV-4616-L, 2016 WL 8674565, at *5

---

[6] *Allison Engine*'s holding was superseded by the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617. *See, e.g., United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 267 n.1 (5th Cir. 2010). However, the general principle for which Relators cite the case, subcontractor liability, was unaffected.

(N.D. Tex. Sept. 16, 2016). "Allegations that lump all defendants together and fail to segregate the alleged wrongdoing of one from those of another do not satisfy Rule 9(b)." *United States ex rel. Ramsey-Ledesma v. Censeo Health, L.L.C.*, Civ. A. No. 3:14-CV-00118-M, 2016 WL 5661644, at *9 (N.D. Tex. Sept. 30, 2016). While DJI is not named as a defendant in the instant action, the problem caused by failure to differentiate between the two entities persists. The Court cannot determine which actions were undertaken by Defendant or whether such actions are sufficient to establish FCA liability.

### ii. *The Alleged Scheme*

Even if the Court were to ignore the confusion between the roles of the two entities, the Second Amended Complaint still would not survive Rule 9(b) scrutiny. Because Relators do not offer "details of an actually submitted false claim," they must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. Relators fail to allege either particular details or reliable indicia.

The Second Amended Complaint lacks details about "the particular workings of a scheme." *Grubbs*, 565 F.3d at 191. It is useful to compare Relators' allegations to the allegations found sufficient in *Grubbs*. The *Grubbs* relator "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot." 565 F.3d at 191-92. In the instant case, Relators have provided some of the particular details found in *Grubbs*; namely, the meeting place, participants, and an approximate date. But that is where the similarities end. Unlike the *Grubbs* relator, Relators in the instant case fail to provide the requisite details to situate the alleged meeting within a broader scheme to submit false claims.

9

First, the temporal connection between the meeting and the alleged submission of false claims is weak at best. Relators allege that the meeting occurred in 2010. Relators often do not provide dates for allegedly false submissions, but, where they do, the dates given are in 2012 or later. *See, e.g.,* Second Am. Compl. ¶ 42 ("Williams repeatedly submitted to the DOL, beginning in September[] 2012 . . . false and fraudulent documentation . . . ."). Relators have not explained why the alleged perpetrators would wait two years to take any action pursuant to a scheme purportedly hatched in 2010.

Second, Relators provide few details about the allegedly false submissions. In *Grubbs*, the relator explained that bills were submitted by doctors, through the hospital, to Medicaid, and the relator also alleged "the type of medical service or its Current Procedural Terminology code that would have been used in the bill." 565 F.3d at 185, 192. By contrast, Relators repeatedly reference Form 2110 and other "documentation submitted to the DOL" but do not provide any further information. Second Am. Compl. ¶ 46. Relators have not alleged what information is contained in Form 2110 or how any representation on Form 2110 would constitute a claim for payment. And, as discussed below, many of Relators' allegations regarding other documents submitted to the DOL are contradicted by the exhibits attached to the Second Amended Complaint. *See infra* § III.A.iii.

Third, most of the individuals who allegedly attended the meeting are rarely, if ever, mentioned in the context of submitting false claims. Throughout the Second Amended Complaint, Relators name many individuals allegedly responsible for making or approving false statements, but almost none of these individuals—other than Martin and Kite—attended the October meeting. *See Career Opportunities*, 2016 WL 8674565, at *5 (faulting relators for failing to "state that a specific employee *knowingly* participated in the fraudulent activity"). Relators allege that Kite,

Martin, Adams, Eddie Williams, and Johnson attended the meeting. Second Am. Compl. ¶ 41. Adams and Johnson are never mentioned again. Relators allege that "Williams" repeatedly submitted false information and prepared and approved the information contained in the DOL's Outreach and Admissions Report Card by Rank for the Report Period 10/1/2012-9/30/2013. Second Am. Compl. ¶¶ 42-43. However, the Complaint defines "Williams" as Relator Dorothy Williams rather than meeting attendee Eddie Williams. *Id.* ¶ 6. Even if the Court were to assume Relators intended to refer to Eddie Williams, Relators contend that Williams's allegedly fraudulent submissions to the DOL began in September 2012. *Id.* ¶ 42. As noted above, it is unclear why Williams would wait almost two years between attending the meeting and putting his part of the purported scheme into action.

Finally, Relators have established no basis for their knowledge of the October meeting. The *Grubbs* court found it significant that the scheme was "communicated directly to the relator by those perpetrating the fraud." 565 F.3d at 191; *see also Ramsey-Ledesma*, 2016 WL 5661644, at *6 (noting that relator had "first-hand experience with the scheme" and "personally observed the conduct she contend[ed] violate[d] the FCA"). Here, none of the Relators allege that they attended the October meeting or establish any other basis for their knowledge of who attended this meeting or what happened there. And, only Relator Jamison establishes a basis for his personal knowledge of actions taken in furtherance of the purported scheme. *See* Second Am. Compl. ¶ 46 (noting that none of Relator Jamison's reports of security-related violations appeared in documentation submitted to the DOL); *see also United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 893 (5th Cir. 2013) (finding complaint inadequate to satisfy *Grubbs* standard where relator "provid[ed] no indicia of any actual knowledge of any FCA-violating fraud").

11

### iii. *The Submissions*

While Relators rely on the allegations about the meeting to establish the broader scheme, they use allegations about departmental submissions in an attempt to provide more particularized details and to offer reliable indicia that false claims were submitted. However, these allegations are insufficient to cure the numerous defects outlined above. Again, a comparison to *Grubbs* is helpful. The *Grubbs* court found that the relator had provided sufficient reliable indicia because he alleged "his first-hand experience of the scheme unfolding as it related to him," described a particular instance in which nursing staff attempted to help him perform his role in the scheme, and alleged specific dates on which the doctors from the meeting acted pursuant to such scheme. 565 F.3d at 192. In the instant case, Relators have not provided comparable reliable indicia.

#### a. *Admissions*

Regarding the admissions department, Relators allege that "65% [of Center enrollees] were either ineligible due to prior disqualifying criminal records or other factors" and that "Williams repeatedly submitted to the DOL . . . false and fraudulent documentation, falsely certifying both [the] number and qualifications of the students." Second Am. Compl. ¶ 42. Relators also point to the portion of the Second Amended Complaint in which they allege the dollar amounts received per month "[a]s a direct result of such false reporting." *Id.* ¶ 44.

Relators' allegations about the admissions department are fatally vague. Relators provide no support for the allegation that 65 percent of enrollees were ineligible for admission, nor do they clarify what disqualified these individuals. A person is not necessarily disqualified from participating in Job Corps solely because he or she has a criminal record. *See* 20 C.F.R. § 670.410(d) ("No one will be denied enrollment in Job Corps solely on the basis of contact with the criminal justice system."). And, Relators' provision of 19 student numbers of students that they

allege "should not have been enrolled at the Center," without more, does not meet the heightened standard for pleading an FCA claim. Second Am. Compl. ¶ 42.

Relators also fail to allege that the supposedly false admissions data was submitted with Form 2110 for payment or that any of the alleged data was incorporated into Form 2110. Instead, Relators allege only that "Williams" submitted false and fraudulent documentation to the DOL and that this fraudulent data somehow made its way into a publicly available DOL "Report Card."[7] This Report Card includes an overall ranking for the NTJCC but does not indicate how admissions data factored into that ranking. *See* Relators' Ex. 4, at 83. In fact, the three scoring categories— Direct Center Services, Initial Career Transition Services, and Long Term Career Transition Services—do not appear to contain evaluations of either the number of students enrolled or their qualifications. *Id.* While Relators do allege that Defendant received a certain amount of money for each student enrolled, their allegations that unqualified students were enrolled and that Defendant falsely reported the number and qualifications of students enrolled are conclusory. *See* Second Am. Compl. ¶ 31. Further, Relators provide no reliable indicia leading to a strong inference that false claims were actually submitted, as Exhibit 4 does not contain any admissions data, and Relators fail to allege that admissions data was incorporated into Form 2110 or any other claim for payment from the Government.

### b. *Security*

Relators' security-related allegations are similarly deficient. Relators allege that Defendant "ignored and covered up serious acts of violence by students . . . which would have disqualified

---

[7] Relators' allegations refer to a document titled "Outreach and Admissions Report Card by Rank for the Report Period 10/1/2012-9/30/2013." Second Am. Compl. ¶ 42. They allege that this report card, supposedly attached to the Complaint as Exhibit 4, shows that "NTJCC had 463 total arrivals" during the relevant period. *Id.* ¶ 43. However, Exhibit 4 is titled "Outcome Measurement System Center Report Card by Rank," covers the period from 7/1/2012-6/30/2013, and does not mention the number of arrivals. *See* Relators' Ex. 4, at 83.

13

them as participants." *Id.* ¶ 46. Relators tie these violations to Defendant's entitlement to payment by the Government, as they note that the failure to report security-related violations to the DOL "impacted directly both the certification of the [NTJCC] and the amount of students legally enrolled for which COI was lawfully entitled to payment." *Id.* However, Relators' vague references to "documentation" and "omissions in reporting" are insufficient to establish the *sine qua non* of § 3729(a)(1)(A): the presentment of a false claim. *Grubbs*, 565 F.3d at 188. Relators do not identify the "documentation" submitted to the DOL and do not explain how such false documentation was submitted to the Government for payment. Second Am. Compl. ¶ 46.

Relators allege that Defendant "submitted [its] requests for payment on Form 2110 without disclosing any [security-related] violations of the DOL regulations and policies, and affirmatively certifying that DOL regulations had been complied with." *Id.* ¶ 49. Again, Relators' allegations are fatally vague. Relators do not describe Form 2110 and do not explain what security-related requirements it contains. In short, Relators' conclusory allegations do not lead to a strong inference that false claims were actually submitted.[8]

### c. *Education*

Relators' assertions regarding students' lack of qualification for diplomas or certificates are also lacking. Relators contend that "[t]eachers at NTJCC were regularly forced to assist the students in their testing for the GED or diploma requirements since COI was rated on the amount

---

[8] In their Response to the Motion to Dismiss, Relators argue that Defendant made false claims because it impliedly certified that it had complied with all DOL requirements for reimbursement and payment despite knowing of the violations reported by Relator Jamison. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016). In *Escobar*, the Supreme Court stated that the implied certification theory has two elements: (1) the claim requests payment and makes specific representations about the goods or services provided; and (2) the failure to disclose noncompliance with material statutory or regulatory requirements makes those representations misleading half-truths. 136 S. Ct. at 2001. Because Relators have not alleged with any level of particularity what specific representations were made to the DOL, the Court cannot evaluate whether Defendant can be held liable under an implied certification theory.

of graduating students and the level of literacy." *Id.* ¶ 53. Students received online instruction through New Learning Resources and traditional instruction through classroom participation at the NTJCC. *Id.* ¶¶ 51-52. Relators allege that Amoran,[9] Martin, and Dawson[10] prepared false and fraudulent reports that stated that students were receiving diplomas even though their scores were as low as second grade for math and fifth grade for reading. *Id.* ¶ 54.

Relators rely on five exhibits attached to the Second Amended Complaint to support their allegations of false and fraudulent reporting to the DOL. The first document, the Report Card discussed above, discloses a literacy ranking of 98 and a numeracy ranking of 79. Relators' Ex. 4, at 83. Only three of 23 Centers included in the Report rank lower in literacy, and only four rank lower in numeracy. *See id.* It is unclear how submitting reports meriting such low scores would serve Defendant's alleged scheme, but Relators note that these rankings, along with the GED/high school diploma ranking of 49, gave the NTJCC an overall ranking sufficient to meet the DOL's goal for the year. Second Am. Compl. ¶ 53. Even accepting Relators' allegations as true, however, Relators fail to connect the alleged fraudulent reporting to the presentment of a false claim to the Government.

The next four documents are high school diplomas issued by New Learning Resources Online and Test of Adult Basic Education diagnostics results. *See* Relators' Exs. 5-8. Although Relators contend that "Exhibits 6 through 8 . . . are examples of the false and fraudulent reporting to the DOL," there is no evidence that these documents were sent to the DOL at all. Second Am. Compl. ¶ 54. And, it is unclear how, if at all, the information contained therein would have been incorporated into Form 2110 or any other document constituting a claim for payment.

---

[9] Amoran's first name and job title do not appear in the Second Amended Complaint.
[10] Dawson's first name and job title do not appear in the Second Amended Complaint.

15

Relators also allege that "COI received additional monies and bonuses from the DOL based upon the amount of students that were reported graduating with a GED, high school diploma or trade certifications." *Id.* ¶ 55. However, without any details or reliable indicia to lead to a strong inference that Defendant actually submitted false claims for payment, this allegation is insufficient to state a presentment claim.

### d. *Placement*

Finally, the allegations regarding job placements are insufficient. The NTJCC received $76,574 for each student placed in a job consistent with his or her training and education. *Id.* ¶ 56. Defendant contracted with a company called Results Staffing Agency ("RSA"). *Id.* ¶ 57. NTJCC career advisors referred students to RSA to fill out job placement paperwork. *Id.* RSA then inputted the applications into their system and filled out employment verification certificates, which were sent to the NTJCC and allegedly forwarded to the DOL. *Id.* According to Relators, Defendant reported these placements, even though the students never actually worked at the alleged places of employment. *Id.* ¶ 58. Amanda Ulliman supervised the career advisors working on placement statistics. *Id.* ¶ 59. The career advisors allegedly had quotas of placements to meet. *Id.* Relators allege that over 80 percent of students reported as being placed were not actually placed. *Id.* Ulliman, Amoran, and Martin allegedly "demanded, approved and directed these phantom 'placements.'" *Id.* Relators estimate that Defendant received between $35,285,299 and $58,808,832 from the DOL due to the allegedly fraudulent reporting of placements. *Id.*

Relators rely on five documents as examples of fraudulent reporting but do not explain how these documents relate to the presentment of false claims for payment. These documents are (1) Educational Institution Placement Verification Forms sent by Job Corps to employers in an effort to "obtain written confirmation of all school placements for former participants" and (2) Job

16

Corps Placement Records that seek to verify former students' employment. *See, e.g.*, Relators' Ex. 9, at 98; Relators' Ex. 10, at 100. On each form is a handwritten note that the former Job Corps student could not be found at the new school or did not work at the place of employment.[11] Relators provide no reliable indicia to support the notion that Defendant concealed this information in any submission to the DOL. And, while Relators allege that over 80 percent of students were fraudulently misrepresented as being placed, they do not allege how this misrepresentation was made or whether it was made in connection with a claim for payment from the Government.

Where a relator does not provide "specific factual details of a fraudulent scheme . . . the holding in *Grubbs* is unavailing to salvage [the] Complaint." *United States ex rel. Wismer v. Branch Banking & Tr. Co.*, Civ. A. No. 3:12-CV-1894-B, 2013 WL 5989312, at *5 (N.D. Tex. Nov. 12, 2013). For all of the foregoing reasons, the Court finds that Relators have failed to provide either specific details or reliable indicia leading to a strong inference that false claims were actually submitted. At most, Relators allege fraudulent activity, but the FCA only attaches liability to "the claim for payment." *Longhi*, 575 F.3d at 467 (quoting *Harrison*, 176 F.3d at 785). Under the *Grubbs* standard, Relators' allegations regarding the claim(s) for payment are inadequate. Thus, the Court dismisses Relators' presentment claim.

### B. *False Record Claim*

Liability under section 3729(a)(1)(B) of the FCA attaches when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The deficiencies discussed at length above, especially Relators' failure to plead with the requisite particularity, are also fatal to Relators' false record claim. Specifically, the Court finds that Relators "point[] to no specific instance of [a false] record or statement." *Nunnally*, 519

---

[11] Relators do not identify who wrote these notes or explain when the notes were added to the documents.

F. App'x at 895. The exhibits relied on by Relators as specific examples of false records or statements do not appear to be related to claims for payment, so it is unclear how they could be material to a false or fraudulent claim. Therefore, the Court grants Defendant's motion to dismiss Relators' false record claim.

### C. *Conspiracy Claim*

Finally, the Court finds that Relators' conspiracy claim is insufficiently pleaded. Under the FCA, conspiracy liability attaches where a person "conspires to commit a violation of" the presentment and/or false record provisions. 31 U.S.C. § 3729(a)(1)(C). To allege a conspiracy, a relator must show the existence of an unlawful agreement to get a false or fraudulent claim paid or allowed and at least one act performed in furtherance of the agreement. *Grubbs*, 565 F.3d at 193. The purported conspirators must share a specific intent to defraud the Government. *United States ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). "The particularity requirements of Rule 9(b) apply to the [FCA's] conspiracy provision with equal force as to its 'presentment' and 'record' provisions." *Grubbs*, 565 F.3d at 193.

Relators have failed to plead an FCA conspiracy with any degree of particularity. Relators argue that Defendant "entered into a conspiracy with DJI and others to defraud the United States" and that Defendant "conspired with DJI, Fluor and others to omit disclosing or to actively conceal facts, which if known, would have reduced or eliminated government obligations and benefits to them." Second Am. Compl. ¶ 73. However, the Second Amended Complaint is devoid of allegations that Defendant, DJI, Fluor, "and others" reached any sort of agreement.

Additionally, Relators did not respond to Defendant's motion to dismiss their conspiracy claim. The Court treats this failure as an abandonment of the conspiracy claim. *See United States ex rel. Phillips v. L-3 Commc'ns Integrated Sys. L.P.*, Civ. A. No. 3:10-CV-1784-L, 2012 WL

3649699, at *9 (N.D. Tex. Aug. 24, 2012) ("Moreover, Relator has provided no response to [defendant's] motion to dismiss his conspiracy claim, and the court treats his failure as an abandonment of the conspiracy claim." (citing *Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 (5th Cir. 2006))). For this additional reason, the Court grants Defendant's motion to dismiss Relators' conspiracy claim.

## IV. CONCLUSION

For the foregoing reasons, the Court grants the Motion to Dismiss and dismisses Relators' causes of action without prejudice. Relators must seek leave to file an amended complaint by February 28, 2019. If a motion for leave to file, with the proposed amended complaint attached, is not filed by this date, Relators' claims will be dismissed with prejudice.

**SO ORDERED.**

SIGNED February 6, 2019.

_____
**KAREN GREN SCHOLER
UNITED STATES DISTRICT JUDGE**